142 N.J. Super. 11 (1976)
359 A.2d 526
URBAN LEAGUE OF GREATER NEW BRUNSWICK, A NON-PROFIT CORPORATION OF THE STATE OF NEW JERSEY; CLEVELAND BENSON; JUDITH CHAMPION; LYDIA CRUZ; BARBARA TIPPETT; KENNETH TUSKEY ON THEIR OWN BEHALF AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS,
v.
THE MAYOR AND COUNCIL OF THE BOROUGH OF CARTERET; TOWNSHIP COMMITTEE OF THE TOWNSHIP OF CRANBURY; MAYOR AND COUNCIL OF THE BOROUGH OF DUNELLEN; TOWNSHIP COMMITTEE OF THE TOWNSHIP OF EAST BRUNSWICK; TOWNSHIP COMMITTEE OF THE TOWNSHIP OF EDISON; MAYOR AND COUNCIL OF THE BOROUGH OF HELMETTA; MAYOR AND COUNCIL OF THE BOROUGH OF HIGHLAND PARK; MAYOR AND COUNCIL OF THE BOROUGH OF JAMESBURG; TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MADISON; MAYOR AND COUNCIL OF THE BOROUGH OF METUCHEN; MAYOR AND COUNCIL OF THE BOROUGH OF MIDDLESEX; MAYOR AND COUNCIL OF THE BOROUGH OF MILLTOWN; TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MONROE; TOWNSHIP COMMITTEE OF THE TOWNSHIP OF NORTH BRUNSWICK; TOWNSHIP COMMITTEE OF THE TOWNSHIP OF PISCATAWAY; TOWNSHIP COMMITTEE OF THE TOWNSHIP OF PLAINSBORO; MAYOR AND COUNCIL OF THE BOROUGH OF SAYREVILLE; MAYOR AND COUNCIL OF THE CITY OF SOUTH AMBOY; TOWNSHIP COMMITTEE OF THE TOWNSHIP OF SOUTH BRUNSWICK; MAYOR AND COUNCIL OF THE BOROUGH OF SOUTH PLAINFIELD; MAYOR AND COUNCIL OF THE BOROUGH OF SOUTH RIVER; MAYOR AND COUNCIL OF THE BOROUGH OF SPOTSWOOD; TOWNSHIP COMMITTEE OF THE TOWNSHIP OF WOODBRIDGE, DEFENDANTS AND THIRD-PARTY PLAINTIFFS,
v.
CITY OF NEW BRUNSWICK AND CITY OF PERTH AMBOY, THIRD-PARTY DEFENDANTS, AND NEW JERSEY LEAGUE OF WOMEN VOTERS AND MIDDLESEX COUNTY LEAGUE OF WOMEN VOTERS, INTERVENORS.
Superior Court of New Jersey, Chancery Division.
Decided May 4, 1976.
*15 Ms. Marilyn J. Morheuser and Mr. Martin E. Sloane, of the New York bar, admitted pro hac vice, and Mr. Daniel A. Searing, of the Maryland bar, admitted pro hac vice, for plaintiffs (Messrs. Baumgart and Ben-Asher, attorneys).
Mr. Peter J. Selesky for defendant Mayor and Council of the Borough of Carteret.
Mr. William C. Moran, Jr. for defendant Township Committee of the Township of Cranbury.
Mr. Dennis J. Cummins, Jr. for defendant Mayor and Council of the Borough of Dunellen.
Mr. Bertram E. Busch for defendant Township Committee of the Township of East Brunswick.
*16 Mr. Roland A. Winter for defendant Township Committee of the Township of Edison.
Mr. Richard F. Plechner for defendant Mayor and Council of the Borough of Helmetta.
Mr. Lawrence Lerner for defendant Mayor and Council of the Borough of Highland Park.
Mr. Guido J. Brigiani for defendants Mayor and Council of the Borough of Jamesburg and Mayor and Council of the Borough of Spotswood.
Mr. Louis J. Alfonso for defendant Township Committee of the Township of Madison (Old Bridge).
Mr. Martin A. Spritzer for defendant Mayor and Council of the Borough of Metuchen.
Mr. Edward J. Johnson, Jr. for defendant Mayor and Council of the Borough of Middlesex.
Mr. Charles V. Booream for defendant Mayor and Council of the Borough of Milltown.
Mr. Thomas R. Farino, Jr. for defendant Township Committee of the Township of Monroe.
Mr. Joseph H. Burns and Mr. Leslie S. Lefkowitz for defendant Township Committee of the Township of North Brunswick.
Mr. Daniel S. Bernstein for defendant Township Committee of the Township of Piscataway.
Mr. Joseph L. Stonaker for defendant Township Committee of the Township of Plainsboro.
*17 Mr. Alan J. Karcher for defendant Mayor and Council of the Borough of Sayreville.
Mr. John J. Vail for defendant Mayor and Council of the City of South Amboy.
Mr. Andre W. Gruber for defendant Township Committee of the Township of South Brunswick.
Mr. Sanford E. Chernin for defendant Mayor and Council of the Borough of South Plainfield.
Mr. Robert C. Rafano and Mr. Gary M. Schwartz for defendant Mayor and Council of the Borough of South River.
Mr. Arthur W. Burgess and Mr. Barry H. Shapiro for defendant Township Committee of the Township of Woodbridge.
Mr. Gilbert L. Nelson for third-party defendant City of New Brunswick.
Mr. Frank J. Jess for third-party defendant City of Perth Amboy.
Mr. William J. O'Shaughnessy for intervenors (Messrs. Clapp & Eisenberg, attorneys).
FURMAN, J.S.C.
Plaintiffs attack the zoning ordinance of 23 of the 25 municipalities of Middlesex County as unconstitutionally exclusionary and discriminatory. Third-party complaints against the cities of New Brunswick and Perth Amboy were dismissed after trial. The remedy sought by plaintiffs is an allocation to each municipality of its fair share of low and moderate-income housing to meet the countywide need. Plaintiffs rely on So. Burl. Cty. N.A.A.C.P. v. Mt. Laurel Tp., 67 N.J. 151, cert. den. 423 U.S. 808, 96 *18 S.Ct. 18, 46 L.Ed.2d 28 (1975), which imposes on a developing municipality the obligation to provide by land use regulations for its fair share of the present and prospective regional need for low and moderate-income housing.
Plaintiffs comprise an organization and five persons who sue individually and as representatives of others similarly situated. The standing of all plaintiffs is challenged. Under Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the individual plaintiffs as nonresidents lack standing to urge federal constitutional and statutory infirmities in municipal zoning. But their standing as nonresidents to pursue state constitutional objections is sustained in Mt. Laurel, supra 67 N.J. at 159. The standing of the three organizations which were plaintiffs in Mt. Laurel was not at issue and not passed on in Justice Hall's opinion.
Plaintiff Urban League of Greater New Brunswick seeks housing for its members and others, mostly blacks and Hispanics, throughout the county and elsewhere nearby, encountering rebuffs and delays. Under the liberal criteria for standing which prevail in this State, standing must be accorded to plaintiff Urban League. Crescent Pk. Tenants Ass'n v. Realty Eq. Corp. of N.Y., 58 N.J. 98 (1971).
No monetary or other specific recovery and no counsel fee for maintaining class actions are sought. Unquestionably, some others are similarly situated to plaintiff Champion, a white, who cannot find adequate low-income housing in the county for her family of three; plaintiff Benson, a black, who cannot find adequate moderate-income housing in the county for his family of 11; plaintiff Tippett, a black, whose family of five is adequately housed in New Brunswick but who cannot find equivalent housing in an unsegregated neighborhood, and plaintiff Tuskey, a white, who objects to the racial and economic imbalance in South Brunswick, the predominately white municipality in which he resides with his family, including two children attending public school. The class actions are maintainable under R. 4:32-1(a) and (b) (3).
*19 At the close of plaintiff's proofs the court dismissed the cause of action for wilful racial discrimination. The impact of low-density zoning is most adverse to blacks and Hispanics, who are disproportionately of low and moderate-income. But no credible evidence of deliberate or systematic exclusion of minorities was before the court. That dismissal must result in the dismissal also of the specific count for violation of Federal Civil Rights Acts, 42 U.S.C.A. §§ 1981, 1982 and 3601 et seq.
The challenge to the exclusionary aspects of defendants' zoning ordinances remains. All three branches of government have recognized overwhelming needs for low and moderate-income housing in the State as a whole.
In Executive Order No. 35, dated April 2, 1976, Governor Byrne stated that
* * * there exists a serious shortage of adequate, safe and sanitary housing accommodations for many households at rents and prices they can reasonably afford, especially for low and moderate income households, newly formed households, senior citizens, and households with children.
The Legislature in the preamble to the New Jersey Housing Assistance Bond Act of 1975, L. 1975, c. 207, § 2(a), made a finding:
Despite the existence of numerous Federal programs designed to provide housing for senior citizens and families of low and moderate income, construction and rehabilitation of such housing units has not proceeded at a pace sufficient to provide for the housing need of the State.
In Mt. Laurel Justice Hall concluded that
There is not the slightest doubt that New Jersey has been, and continues to be, faced with a desperate need for housing, especially of decent living accommodations economically suitable for low and moderate income families. [67 N.J. at 158]
Other recent legislation dealing with the housing shortage is set out in Mt. Laurel at 179.
*20 In Middlesex County the shortage of low and moderate-income housing is critical. From 1960 to 1970 the number of new jobs in the county increased by 2.2 times the number of new housing units, and the number of employees in the county residing outside the county increased by 291%. In 1960 the total vacant land in the county was zoned 24.9% for industry, 22.7% for one-acre or larger single-family housing, 21.5% for less than one-quarter acre single-family housing and 2.1% for multi-family housing. Ten years later the zoning countywide was markedly more exclusionary: 41.7% for industry, 38.7% for one-acre or larger single-family housing, 4.9% for less than one-quarter acre single-family housing, and .5% for multi-family housing.
The pattern of dwindling low and moderate housing opportunities has continued in the county since 1970. Minimal modest lot single-family housing has been built. Housing congestion is worsening in the urban ghettoes. New mobile homes are prohibited in all municipalities. Thirteen municipalities have enacted rent control ordinances in response to the multi-family housing shortage.[1] Vacancy rates are low. Despite overzoning for industry, new industry is reluctant to settle in the county because of the shortage of housing for its workers. Experts for various defendants acknowledged a substantial market and a pressing need for new low and moderate housing.
The issue whether Middlesex County is a housing region is of significance because of the adoption of the term "region" in Mt. Laurel. Housing which must be afforded by a developing municipality is defined as its fair share of the present and prospective regional need. In Oakwood at Madison, *21 Inc. v. Madison Tp., 117 N.J. Super. 11 (Law Div. 1971), certif. granted 62 N.J. 185 (1972), on remand 128 N.J. Super. 438 (Law Div. 1974), this court struck down a zoning ordinance which failed to provide for a fair proportion of the housing needs of the municipality's own population and of the region, holding that it was in derogation of the general welfare encompassing housing needs and therefore unconstitutional. Justice Hall noted in Mt. Laurel
The composition of the applicable `region' will necessarily vary from situation to situation and probably no hard and fast rule will serve to furnish the answer in every case. [67 N.J. at 189]
Middlesex County is part of the New York metropolitan region. Plainsboro and Cranbury and portions of South Brunswick and Monroe to the southwest of the county are in some measure also part of the Philadelphia metropolitan region. Those areas look predominately towards Trenton, Princeton and Hightstown in Mercer County for local shopping and services. In the north of the county South Plainfield, Dunellen and Middlesex and portions of Piscataway and Edison look predominately towards Plainfield in Union County for local shopping and services. The balance of the county is oriented within the county, towards New Brunswick, Perth Amboy or elsewhere, for local shopping and services.
Regions are fuzzy at the borders. Middlesex County is a Standard Metropolitan Statistical Area as fixed by the United States Office of Management and Budget. Such an area is specified as an integrated economic and social unit with a large population nucleus. Twenty of the 25 municipalities joined in a Community Development Block Grant application as an "urban county" under the regulations of the Housing and Community Development Act of 1974, 42 U.S.C.A. § 5301 et seq.[2] A county master plan and a *22 wealth of applicable statistics are available through the county planning board. Some one employed in any municipality of the county may seek housing in any other municipality, and someone residing in any municipality may seek employment in any other municipality. Residence within walking distance of the place of employment, or within the same municipality, is no longer a desideratum. Nor is the availability of public transportation a major factor. The county is crisscrossed by arterial highways, including the New Jersey Turnpike and the Garden State Parkway. Mobility by automobile is the rule. A large proportion of even the low-income wage earners within the county own automobiles and many of those travel regularly 20 miles or more to their places of employment. The entire county is within the sweep of suburbia. Its designation as a region for the purpose of this litigation, within larger metropolitan regions, is sustained.
In compliance with Mt. Laurel plaintiffs undertook to establish by a prima facie showing that each of the 23 defendant municipalities' zoning ordinances was constitutionally invalid because of failure to provide for a fair share of the low and moderate-income housing needs of the region. That burden was met as to 11 municipalities, as will be analyzed infra. Dunellen was granted an outright dismissal. With a population of over 7,000 in a square mile area and about 42% low and moderate-income households, Dunellen has less than 20 acres of vacant land, mostly unsuitable for housing, and no patently exclusionary provisions in its zoning ordinance.
In addition, 11 municipalities  Carteret, Helmetta, Highland Park, Jamesburg, Metuchen, Middlesex, Milltown, South Amboy, South River, Spotswood and Woodbridge  were granted dismissals conditional upon adoption of amendments to their zoning ordinances which are agreed to by their respective attorneys, accepted by plaintiffs and approved by the court. These amendments include the following: Deletion of limitations on the number of bedrooms or *23 of rooms in multi-family housing;[3] deletion of restrictive special exception procedures for multi-family housing and provision for it as an allowable use;[4] reduction of excessive parking space requirements in multi-family housing;[5] reduction of excessive minimum floor area requirements in multi-family or single-family housing or both;[6] reduction of excessive minimum lot sizes for multi-family or single-family housing or both,[7] increase of maximum density of multi-family housing to 15 units per acre,[8] increase of maximum height of multi-family housing to 2 1/2 stories or higher;[9] deletion of a multi-family housing ceiling of 15% of total housing units within a municipality;[10] rezoning from industry to multi-family residential[11] and from single-family to multi-family residential.[12] A number of these agreed revisions have been enacted.
*24 The 11 municipalities which were dismissed conditionally from the litigation are substantially built up without significant vacant acreage suitable for housing, except Woodbridge with about 800 acres, Spotswood with about 200 acres and Jamesburg, South Amboy and South River with about 100 acres each. In view of the consent dismissals no issue is before the court whether these 11 municipalities are "developing municipalities" in the sense of that term in Mt. Laurel. Incontrovertibly, a fair share allocation of a substantial number of new housing units to meet regional needs would be nugatory in a municipality with minimal vacant acreage. But a municipality is not exempt from the constitutional standards of reasonableness in its zoning because it is not "developing" within Mt. Laurel.
Exemption from Mt. Laurel was pressed by Cranbury and Plainsboro on another ground. Mt. Laurel (67 N.J. at 160) cites as one of the characteristics of a developing municipality that it has undergone a great population increase since World War II. These two townships have not, in contrast to the explosive growth countywide. But their relatively static population is attributable in large measure to restrictive zoning. Past exclusionary practices cannot shield them from an obligation to meet their fair share of regional housing needs.
Eleven municipalities were not dismissed outright or conditionally and, as prescribed in Mt. Laurel, assumed the "heavy burden" of establishing peculiar circumstances justifying their failure to afford the opportunity for low and moderate income housing to the extent of their respective fair shares. These 11 municipalities comprise seven townships south of the Raritan River (Cranbury, East Brunswick, Old Bridge (formerly Madison), Monroe, North Brunswick, Plainsboro and South Brunswick), two townships north of the Raritan River (Edison and Piscataway), and two boroughs, Sayreville south and South Plainfield north of the Raritan River.
*25 The exclusionary zoning practices in some or all of these 11 municipalities, compounded in effect because of the proximity of several to each other, embrace overzoning for industry and low-density residential housing, underzoning for high-density single-family and multi-family residential housing, prohibition of multi-family housing and mobile homes, bedroom and density restrictions on multi-family housing excluding couples with two or more children, and floor area and other restrictions on multi-family housing forcing up construction costs.
Prior to a discussion seriatim of the 11 zoning ordinances, population, income, employment and vacant acreage tables are appropriate.
East Brunswick, Edison, Monroe, North Brunswick, Old Bridge, Piscataway, Sayreville, South Brunswick and South Plainfield underwent a population upsurge since 1950 even beyond the 120% gain in the county. Only Cranbury and Plainsboro trailed perceptibly behind.

 POPULATION INCREASE
 1950 1960 1970 1950-1970
Cranbury 1,797 2,001 2,253 25%
East Brunswick 5,699 19,965 34,166 500%
Edison 16,348 44,799 67,120 310%
Monroe 4,082 5,831 9,138 124%
North Brunswick 6,450 10,099 16,691 159%
Old Bridge 7,366 22,772 48,715 561%
Piscataway 10,180 19,890 36,418 258%
Plainsboro 1,112 1,171 1,648 48%
Sayreville 10,338 22,553 32,508 214%
South Brunswick 4,001 10,278 14,058 251%
South Plainfield 8,008 17,879 21,142 164%
Middlesex County 264,872 433,856 583,813 120%

Based on the 1970 census, low income in the following table is figured as up to $7,000 a year and moderate income up to $10,000. Those limits approximate the bottom 20% and the next 20% in the State as a whole, and compare closely in Middlesex County with the Federal Department of Housing and Urban Development standards of low income as up *26 to 50% of median income and moderate income as 50 to 80% of median income. Among the 11 municipalities only Piscataway, with Rutgers University married student housing, and Plainsboro, with farm labor housing, exceed the county percentage of low and moderate-income families. Most are within 15% of the county percentage. Edison and South Plainfield are within 25%. Only East Brunswick may be characterized as an elite community. In contrast, New Brunswick and Perth Amboy both had 54% low and moderate income population, Jamesburg 49% and Helmetta 48%.

 INCOME BY FAMILIES IN 1970
 % Low Income % Moderate Income
Cranbury 20 11
East Brunswick 7 11
Edison 11 15
Monroe 12 21
North Brunswick 12 18
Old Bridge 12 19.5
Piscataway 14 21.5
Plainsboro 23 20.5
Sayreville 10 20
South Brunswick 12.5 17
South Plainfield 11 15
Middlesex County 15 19

Industrial employees in the following table are defined as employees in manufacturing, wholesale, transportation, utilities and construction. The projections for the year 2000 are based upon county planning board estimates, as modified upward in Edison, Monroe and Old Bridge according to fact findings by the court. In eight of the 11 municipalities there are glaring deficiencies in low and moderate-income housing, as measured by low and moderate-income population, for the industrial employees within that municipality. In East Brunswick the deficiency is less but over 40%. Only Monroe and Old Bridge apparently offer adequate housing opportunities for their blue collar workers. By the year 2000 the deficiencies in low and moderate income housing for industrial employees within each municipality would be of disastrous *27 proportions under present zoning. See Justice Hall's statement in Mt. Laurel:
Certainly when a municipality zones for industry and commerce for local tax purposes, it without question must zone to permit adequate housing within the means of the employees involved in such uses. [67 N.J. at 187]
It is pertinent to note that at present an estimated 75,000 residents of the county are employed outside the county, as compared to an estimated 55,000 residents elsewhere who are employed within the county.

 INDUSTRIAL ACREAGE AND EMPLOYEES
 1967 2000 projected
 acres in use employees acres in use employees
Cranbury 185 1,362 678 7,876
East Brunswick 378 2,176 1,377 11,877
Edison 1,789 15,823 3,950 39,589
Monroe 266 460 1,860 15,033
North Brunswick 1,231 11,739 2,347 23,204
Old Bridge 1,685 494 2,685 9,824
Piscataway 346 6,898 1,388 16,746
Plainsboro 229 438 557 4,253
Sayreville 967 8,786 2,091 20,670
South Brunswick 718 3,586 1,872 18,695
South Plainfield 509 3,767 1,187 11,259

The vacant acreage statistics in the following table are compiled from answers to interrogatories by the respective municipalities, data of the State Department of Community Affairs and relevant testimony. Gross vacant acreage suitable for housing excludes identified environmentally critical land, that is, short-term flood plains, aquifer outcrops and swamps essential to water resources, also grades of 12% or steeper and proposed park land. Net vacant acreage also excludes vacant land reasonably zoned for industry and commerce and all farmland in present use. Manifestly there is ample vacant land in all 11 municipalities suitable for 2,000 or more units of low and moderate-income housing at densities of five to ten units an acre. The major land resource *28 of the county in the more distant future must rest in Monroe, Old Bridge and South Brunswick. With such significant open acreages all 11 municipalities fit within the Mt. Laurel criterion of "developing municipalities".

 VACANT ACREAGE
 TOTAL SUITABLE FOR HOUSING
 ACREAGE Gross Net
Cranbury 8,614 6,891 1,700
East Brunswick 14,342 3,521 1,600
Edison 27,289 5,756 2,200
Monroe 26,041 21,819 11,500
North Brunswick 7,628 2,717 1,600
Old Bridge 25,126 15,000 13,500
Piscataway 12,288 2,637 1,315
Plainsboro 7,680 5,437 1,130
Sayreville 10,560 4,083 1,800
South Brunswick 28,788 23,470 17,000
South Plainfield 5,344 1,542 740

Cranbury is an historic village in the midst of farmland. In active farm use are 4,468 acres or 52% of its total area. An aquifer underlies much of it. The Upper Millstone River on its southerly and westerly borders is dangerously polluted. Meadowland along the river is designated as regional open space in the county master plan of 1970. Two major highways bisect Cranbury. Its residents who are employed outside Cranbury travel about half to the north and east and half to the south and west. It has 44 substandard housing units[13] and 90 occupied by households requiring a governmental housing subsidy.
Cranbury's zoning ordinance permits no new multi-family housing, except conversions to two family. Minimum lot size of 15,000 square feet are permitted only in the substantially built-up village. Elsewhere the minimum lot size is 40,000 square feet. The township is overzoned for industry by over 2,000 acres, and over 500% of projected demand. A zoning amendment is under study to permit multi-family housing, *29 with some low and moderate-income units, to the east of the village along Brainerd Lake. A sewer system would tie in to the Middlesex County Sewerage Authority.
Cranbury's present zoning ordinance falls short of the Mt. Laurel standard and must be struck down in view of available suitable acreage adjoining the village on which low and moderate-income housing may be built without impairing the established residential character of the village or interfering with present farm uses.
East Brunswick is a relatively low-density residential municipality centrally located and bisected by major highways. It has established middle and high-income neighborhoods. Less than 1,000 acres is farmland in use. Much of its undeveloped land is environmentally sensitive: aquifer outcrops, tidal marshes along the Raritan and South Rivers, other flood plains along several brooks, and steep hilly terrain. Sewage disposal and drainage are problems because of the high water table and clay soil in many areas. The northernmost fringes of the pine barrens are in the township. It has 244 substandard housing units and 348 occupied by households requiring a governmental housing subsidy.
Its zoning ordinance provides preponderately for one-acre and half-acre single-family housing with cluster options. Minimum floor areas of 1,500 square feet and minimum frontages exceeding 100 feet in most zones substantially exclude low and moderate income housing. Virtually no vacant land is available for single-family housing on 10,000 square foot lots or for multi-family housing. Maximum densities of 12 units an acre and other restrictions on multi-family housing drive up construction costs. The township is overzoned for industry by over 1,100 acres, and over 250% of projected demand. A master plan revision is being worked on.
East Brunswick's zoning ordinance must be held invalid under Mt. Laurel. Absence of sewer utilities is not *30 per se an exemption from Mt. Laurel. As stated by Justice Hall (67 N.J. at 186), even in soil with a permeability problem "the township could require [sewer and water utilities] as improvements by developers or install them under the special assessment or other appropriate statutory procedure."
Edison is a hub of highway, rail and deep water transportation. It has 520 substandard housing units and 1,879 occupied by households requiring a governmental housing subsidy. As noted supra, its low and moderate-income population is about 25% below that of the county, and it falls markedly short of providing low and moderate-income housing opportunities for its more than 15,000 industrial workers.
Its zoning ordinance authorizes diversity of housing but only 5% of its vacant land is zoned for multi-family housing, including 10 acres for high-rise apartments, and only 5% for single-family housing on 7,500 square foot lots. No other residential zone offers a realistic possibility, even with cluster options, for low and moderate-income housing because of lot size, floor area and frontage restrictions. The township is overzoned for industry by about 500 acres. Several housing projects are under way with governmental subsidies. The township is the subject of a consent judgment of the United States District Court to participate in various programs administered by the Department of Housing and Urban Development for new housing and rehabilitation of substandard housing and for sewage and other improvements.
Edison's zoning ordinance likewise must be struck down under Mt. Laurel, chiefly because of maldistribution of vacant land into low-density rather than high density residential uses, and to a lesser extent because of maldistribution of vacant land into industrial use.
Monroe has the largest farmland acreage in the county, although less proportionately than Cranbury and Plainsboro. Four water courses with adjoining flood plains flow *31 through it. The water table is high because of acquifers. Much of the soil is relatively impermeable. Without much industry locally, there is nevertheless ready access by highway to nearby industry and other places of employment. Monroe has 210 substandard housing units and 195 occupied by households requiring a governmental housing subsidy.
Monroe's zoning ordinance prohibits new multi-family housing except in planned retirement communities, requiring various amenities, on lots of 400 acres or more. The vacant acreage exceeding 20,000 acres is virtually preempted by industrial and rural residential zones. In the latter the restrictions, including 30,000 square foot lot sizes, inhibit low and moderate-income housing. The township is overzoned for industry by over 5,000 acres and over 400%.
The township's present zoning ordinance is palpably deficient under Mt. Laurel. Its own planning expert conceded a need for multi-family residential zoning with densities and other provisions compatible with low and moderate-income housing opportunities. Likewise, there is a glaring maldistribution into industrial and low-density residential uses rather than high-density residential uses.
North Brunswick is highly industrialized on major highway and rail routes. It has 99 substandard housing units and 473 occupied by households requiring a governmental housing subsidy.
Its zoning ordinance restricts most of the vacant land suitable for housing to single-family use on lots of 15,000 square feet or more, with frontages of 120 feet or more and floor areas of 1,200 square feet or more, and to multi-family use on five-acre minimum lots with maximum densities of only ten units an acre, or seven units an acre in Planned Unit Developments, and bedroom, parking and other restrictions substantially foreclosing low and moderate-income housing opportunities. The township is overzoned for industry by nearly 1,000 acres and 200%.
*32 North Brunswick's zoning ordinance is held invalid under Mt. Laurel for reasons paralleling those applicable to Edison's ordinance.
Old Bridge's zoning ordinance was struck down by this court in Oakwood at Madison, supra. The two previous trial records were stipulated. Identical conclusions are reached, with the additional factual determinations that Old Bridge is overzoned for industry beyond reasonable projections by over 3,000 acres and over 400% and that it has 489 substandard housing units and 1,271 occupied by households requiring a governmental housing subsidy.
Piscataway is a sprawling township on the north bank of the Raritan River, reaching towards Plainfield and Bound Brook in Somerset County to the north and west and towards New Brunswick to the east. It has substantial industry. Its housing stock affords its fair share of present low and moderate-income units. It has 324 substandard housing units and 1,187 occupied by households requiring a governmental housing subsidy.
Piscataway's zoning ordinance inhibits appreciable further low and moderate-income housing opportunities. The township is not overzoned for industry, but 80% of its vacant residentially zoned land is zoned for single-family housing on half-acre minimum lots with a 20% cluster option, and only between 1 and 2% is zoned for multi-family housing. Various restrictions force up construction costs and discourage two or three-bedroom multi-family units: five-acre minmium lot size, maximum density of 15 bedrooms an acre, minimum storage area of 160 square feet a unit and minimum floor areas of 700 square feet in one-bedroom apartments and 900 square feet in two-bedroom apartments. A zoning revision is under study to rezone 300 acres or more for Planned Residential Developments as an alternative to single-family housing, with mandatory minimums of low and moderate-income units.
Prior to such a revision, along with elimination of bedroom and other restrictions on multi-family housing, Piscataway's *33 zoning ordinance must be held unconstitutional under Mt. Laurel as not providing adequately for prospective regional housing needs.
Plainsboro has over 50% of its total area in use as farmland. Its farms average over 300 acres. Other than wetlands and flood plains along several water courses, its soil is prime for agriculture and favorable for housing. It has 26 substandard housing units and 81 occupied by households requiring a governmental housing subsidy.
Plainsboro's ordinance zones most vacant land for industry, for single-family housing on 35,250 square foot minimum lots with 200-foot minimum frontages, subject to cluster options of 15,000 square foot minimum lots, and for Planned Community and Planned Multi-Use Developments. Bedroom restrictions on multi-family housing were recently deleted. Other exclusionary restrictions on multi-family housing remain in effect. The township is overzoned for industry by about 2,000 acres and 700%. A 600-acre Planned Community Development providing significant low and moderate-income housing is under construction. Princeton University is planning a research center with multi-family housing units, including at least 20% low and moderate-income, between Lake Carnegie and U.S. Route 1.
Plainsboro's zoning ordinance, as constituted, is deficient under Mt. Laurel in failing to afford affirmatively its fair share of prospective regional housing needs.
Sayreville is a heavily industrialized borough surrounded on three sides by tidewater, with a deep water channel on the Raritan River. Much of its vacant acreage is abandoned sand pits. It has 467 substandard housing units and 674 occupied by households requiring a governmental housing subsidy.
Its zoning ordinance provides cluster and townhouse options in single-family residential zones. Planned Unit Developments are allowable uses in industrial zones. Minimum lot sizes for Planned Unit Developments are excessive  100 acres under one option and 250 acres under the alternative *34  as are the requirements of 10% of total area in commercial use and 25% in industrial use. A density restriction under 15 units an acre, minimum lot size of five acres and excessive minimum floor areas curtail low and moderate-income housing in garden apartments. The borough is overzoned for industry apart from the Planned Unit Development alternatives. Major townhouse, garden apartment and senior citizen housing projects, which would provide over 600 low and moderate-income units, are under construction, approved or under review.
Sayreville's zoning ordinance is held invalid under Mt. Laurel. Its fair share allocation as determined infra should be attainable with relatively minor revisions.
South Brunswick is a sprawling township in the path of development both from New York and Philadelphia. Major highways and public transportation by railroad and bus are available. Several thousand acres of vacant land zoned for single-family housing on one, three and five-acre minimum lots are abandoned farmland. Aquifers underlie much of the township. Swamps, flood plains and aquifer outcrops rule out housing over extensive sections. Protection of aquifer recharge areas may be accomplished by retention ponds in medium and high-density residential zones, as well as industrial zones. An expert for the township conceded a population capacity of at least 100,000 without endangering environmentally sensitive land. Water and sewer utilities are lacking in much of the township. Such infrastructure is feasible. Development may fan out from the four scattered villages. The township has 149 substandard housing units and 284 occupied by households requiring a governmental housing subsidy.
Amendments to South Brunswick's zoning ordinance in recent years have lessened its exclusionary impact. Mandatory minimums of 5% low-income and 5% moderate-income units have been set in Planned Residential Developments  nevertheless, less than the county's and the township's own proportions of low and moderate-income households. The *35 township is overzoned for single-family housing on lots of one acre or more with frontages of 120 feet or more, and for industry by over 7,000 acres and over 700%. No multi-family housing is permitted outside Planned Residential Developments. One such development under construction near Dayton and others proposed or under review would augment low and moderate-income housing stock.
South Brunswick's zoning ordinance remains invalidly exclusionary under Mt. Laurel and must be struck down.
South Plainfield has convenient access to other municipalities of the county via Federal Interstate Highway 287. It has railroad freight transportation. Since World War II the borough has experienced upsurges in both population and industry. Housing development on its remaining open acreage which is not swamp or flood plain may be impeded by high costs of sewer construction through shale. The borough has 173 substandard housing units and 303 occupied by households requiring a governmental housing subsidy.
South Plainfield's zoning ordinance prohibits multi-family housing except two-family housing by conversion in any residential zone and in business zones. Most of its vacant acreage zoned for single-family housing is subject to excessive minimum lot size and minimum floor area restrictions. The borough is overzoned for industry by about 400 acres. Its zoning falls palpably short of meeting the housing needs of its industrial employees. Applying Mt. Laurel, South Plainfield's ordinance is held unconstitutional because of failure to provide for a fair share of its own and the county's low and moderate-income housing needs.
The final issue is the remedy. The zoning ordinances of 11 defendant municipalities have been held unconstitutional. The 11 municipalities have been determined to be part of a region comprising Middlesex County for the purpose of this litigation. The remaining determination is the fair share allocation of low and moderate-income housing to each of the 11 municipalities.
*36 A factual finding must therefore be made as to the county-wide low and moderate-income housing need projected to 1985. New units will be required to replace present substandard housing, for most of those filling new jobs in the county, for increasing numbers of retired persons and for other increments to population. Against this total must be deducted rehabilitated units through governmental subsidies and otherwise, units "filtering through" as occupants move up to higher income housing and units projected to be built under present or revised zoning in New Brunswick, Perth Amboy and the 12 municipalities which were dismissed outright or conditionally from this litigation, in particular Woodbridge, Spotswood, Jamesburg, South Amboy and South River which have significant vacant acreages. Taking into account county planning board population and job growth projections to 1985, estimating one-third of new jobs as low and moderate-income, and a ratio, as at present, of 73% of low and moderate-income employees also residing within the county, the total additional low and moderate-income housing need in the county to 1985 is fixed at 18,697 units.
The initial fair share allocation must be to correct the present imbalance, that is, to bring each defendant municipality up to the county proportion of 15% low and 19% moderate-income population. The county proportion rather than the state proportion of 20% low and 20% moderate-income is determined upon. The historic trend of urban dispersal from New York and Philadelphia is that per capita incomes in counties are higher in inverse ratio to distance from the central city. The allocation to correct imbalance results in the following additional low and moderate-income housing units.

 Cranbury 18
 East Brunswick 1,316
 Edison 1,292
 Monroe 23
 North Brunswick 180

*37
 Old Bridge 301
 Piscataway 0
 Plainsboro 0
 Sayreville 328
 South Brunswick 156
 South Plainfield 416
 _____
 4,030

Subtracting 4,030 from the 18,697 low and moderate income housing units needed in the county to 1985, the balance is 14,667 or approximately 1,333 per municipality. There is no basis not to apportion these units equally. Each municipality has vacant suitable land far in excess of its fair share requirement without impairing the established residential character of neighborhoods. Land to be protected for environmental considerations has been subtracted from vacant acreage totals. No special factor, such as relative access to employment, justifies a deviation from an allocation of 1,333 low and moderate housing units, plus the allocation to correct imbalance, to each of the 11 municipalities.
Low and moderate-income housing units should be divided 45% low and 55% moderate. Low income is defined as up to 50% of median income in the county, and moderate income as 50 to 80% of median income, according to current data of the county planning board. Within each municipality there may be flexibility  for example, multi-family housing at densities of ten or more units an acre, multi-family housing encompassing a diversity of housing but with mandatory minimums of low and moderate-income units; mobile homes at densities of five to eight units an acre,[14] and single-family housing at densities of four or *38 more units an acre. A combination of these alternatives may be arrived at. Each municipality would receive credit for pending low and moderate income construction for which certificates of occupancy have not been granted as of the date of this judgment.
After the allocation to correct imbalance, Cranbury, East Brunswick, Edison, North Brunswick, Piscataway, Plainsboro, Sayreville and South Plainfield are ordered to rezone their respective net vacant acreage suitable for housing, as shown in the fourth table supra, 15% for low income and 19% for moderate income on the basis of 100% zoning for housing (which this judgment does not require). The housing units thus afforded should approximate the allocation of 1,333 units each. As to any municipality, if it appears that such rezoning would fall significantly short of the allocation of 1,333 units, plus the allocation to correct imbalance, application to modify this judgment may be brought.
Monroe, Old Bridge and South Brunswick, all with net vacant land suitable for housing exceeding 10,000 acres, are ordered to rezone to provide their respective allocations of 1,333 units, plus their respective allocations to correct imbalance, by any combination of multi-family, mobile home or single-family housing.
As stated by Justice Hall in Mt. Laurel (67 N.J. at 192), "Courts do not build housing * * *." In implementing this judgment the 11 municipalities charged with fair share allocations must do more than rezone not to exclude the possibility of low and moderate-income housing in the allocated amounts. Approvals of multi-family projects, including Planned Unit Developments, should impose mandatory minimums of low and moderate-income units. Density incentives may be set. Mobile homes offer a realistic alternative *39 within the reach of moderate and even low-income households. Whether single-family housing is attainable for moderate-income households may hinge upon land and construction costs. The 11 municipalities should pursue and cooperate in available federal and state subsidy programs for new housing and rehabilitation of substandard housing, although it is beyond the issues in this litigation to order the expenditure of municipal funds or the allowance of tax abatements. See Hills v. Gautreaux, ___ U.S. ___, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976), holding that a federal district court has the authority to order the Department of Housing and Urban Development to undertake a regional plan for low-income and integrated housing to remedy housing discrimination fostered by H.U.D. practices in a central city, with the consent of suburban municipalities.
Judgment in accordance herewith to be effective after 90 days. Jurisdiction is retained.
NOTES
[1] East Brunswick, Edison, Highland Park, Metuchen, Middlesex, New Brunswick, North Brunswick, Old Bridge, Perth Amboy, Piscataway, Sayreville, South Brunswick, Woodbridge. Municipal police power to enact rent control ordinances was upheld in Inganamort v. Fort Lee, 62 N.J. 521 (1973), because of the critical housing need.
[2] Edison, New Brunswick, Perth Amboy, Sayreville and Woodbridge submitted their separate applications as "entitlement municipalities."
[3] Carteret, Highland Park, Middlesex, South Amboy, Spotswood, Woodbridge. Mt. Laurel 67 N.J. at 182-183.
[4] Jamesburg, Middlesex, Milltown, South Amboy, South River, Woodbridge.
[5] Jamesburg, Milltown. Reductions to 1.5 parking spaces minimum per unit were agreed to.
[6] Jamesburg, Metuchen, Milltown, South Amboy, Spotswood, Woodbridge. Reductions to less than 1,000 square feet minimum per single-family unit, to less than 700 square feet minimum per one bedroom multi-family unit, and to less than 550 square feet minimum per efficiency unit, were agreed to.
[7] Carteret, Highland Park, Middlesex, South River, Spotswood, Woodbridge. Reductions to less than 10,000 square feet minimum single-family lot and to less than three-acre minimum multi-family lot were agreed to.
[8] South Amboy.
[9] South Amboy, South River.
[10] South River.
[11] South Amboy, Spotswood.
[12] Helmetta, Milltown, South Amboy, South River, Spotswood, Woodbridge.
[13] Defined as deteriorated, dilapidated, overcrowded, without plumbing or without kitchen facilities.
[14] Vickers v. Gloucester Tp. Comm., 37 N.J. 232 (1962), cert. den. 371 U.S. 233, 83 S.Ct. 326, 9 L.Ed.2d 495 (1963), upheld the constitutionality of a zoning ordinance which prohibits mobile homes anywhere in a sprawling, largely undeveloped municipality. But Vickers is not a bar to zoning, otherwise reasonable, to allow mobile homes.