PASCACK ASSOCIATION, LIMITED, PLAINTIFF-APPEL-
LANT, v. MAYOR AND COUNCIL OF THE TOWNSHIP
OF WASHINGTON, BERGEN COUNTY, NEW JERSEY,
DEFENDANTS-RESPONDENTS.

WALDY, INC., PLAINTIFF-APPELLANT, v. THE BOARD OF
ADJUSTMENT AND THE TOWNSHIP COUNCIL OF THE
TOWNSHIP OF WASHINGTON, BERGEN COUNTY, NEW
JERSEY, AND WASHINGTON LAKES ASSOCIATION, A
CORPORATION OF THE STATE OF NEW JERSEY, DE-
FENDANTS-RESPONDENTS.

Argued May 25, 1976—Decided March 23, 1977.

472

Mr. *Alan J. Werksman* argued the cause for appellants (*Messrs. Werksman, Saffron, Cohen, Sylvester & Miller,* attorneys; *Mr. Werksman* and *Mr. Eugene P. Sylvester* on the brief).

Mr. *Leonard Adler* argued the cause for respondents Mayor and Council and Board of Adjustment of Washington Township.

Mr. *Peter A. Buchsbaum,* Assistant Deputy Public Advocate, argued the cause for *amicus curiae* Public Advocate (*Mr. Stanley C. VanNess,* Public Advocate, attorney; *Mr. Buchsbaum, Mr. Carl S. Bisgaier,* Deputy Director of Division of Public Interest Advocacy, and *Mr. Kenneth E. Meiser,* Assistant Deputy Public Advocate, on the brief).

No appearance was made on behalf of respondent Washington Lakes Association.

The opinion of the Court was delivered by

CONFORD, P. J. A. D., Temporarily Assigned. This appeal projects the significant issue as to whether, in the wake of the decisions of this court imposing upon developing municipalities the obligation of providing by zoning for the opportunity to create housing for the low and moderate income segments of the population, see *So. Burl. Cty. N. A. A. C. P. v. Tp. of Mt. Laurel,* 67 *N. J.* 151, app. dism. and *cert.* den., 423 *U. S.* 808, 96 *S. Ct.* 18, 46 *L. Ed.* 2d 28 (1975) (*Mount Laurel,* hereinafter) ; *Oakwood at Madi-*

*son, Inc. et al. v. The Township of Madison,* 72 *N. J.* 481 (1977), (*Oakwood at Madison,* hereinafter) all municipalities, regardless of the state or character of their development, have an obligation to zone for multi-family housing on behalf of middle income occupants if there is a local and regional shortage of multifamily housing in general. More specifically, the issue is whether there is such an obligation on the part of a small municipality, developed substantially fully upon detached single-family dwellings and restricted accordingly in the residential provisions of its zoning ordinance.

Holding in the affirmative on the stated issues, the judgment of the Law Division mandated the grant of a building permit for such purpose to the appellant property owner with respect to its 30-acre tract of land. The Appellate Division reversed, and we granted certification to pass upon the important questions presented. 69 *N. J.* 73 (1975).

The initial action herein was commenced in 1970 when plaintiff Pascack Association Limited ("Pascack") filed a complaint in lieu of prerogative writ, attacking the rezoning of its property to permit the additional use of offices and research (OR) and challenging the validity of the prior ordinance limiting its residential development to two-acre single-family lots. Thereafter, in August 1971, Waldy, Inc. ("Waldy"), contract purchaser of the property involved, after unsuccessfully applying for a variance to build a 520 unit garden apartment complex on the property, began an action to set aside the variance denial and challenge the entire ordinance for failing to make provision anywhere for multi-family and rental housing. Shortly thereafter the actions were consolidated for trial. In May 1972 by leave of court an amended complaint was filed by both plaintiffs joining as party-defendant the trustees of the Washington Lakes Association and contesting the validity of certain private deed restrictions on file with the Bergen County Clerk's Office, enforcement of which would

preclude plaintiffs' proposed development on a portion of the tract.

On December 20, 1972, the trial court after a hearing issued a memorandum decision: (1) holding invalid the two-acre minimum lot size for single-family residences; (2) holding the entire Washington Township zoning ordinance invalid for failure to make any provision for "multiple and rental housing"; and (3) reversing the board of adjustment's denial of a recommendation for a use variance and remanding the application to the board for reconsideration.

The consequent judgment, entered January 16, 1973, restricted the invalidation of the ordinance to its prohibition of "multiple and rental housing" and the nullification of the lot size limitation. The order recited that it was a "final judgment" and that the court did not retain jurisdiction. There was no direction to the municipality to rezone within any specified period of time, as is customary in such situations.

On January 29, 1973, presumably in response to the judgment, the township passed Ordinance No. 73–1, rezoning a different 34-acre area (in diverse ownership) for multifamily residential use. On February 15, 1973 the board of adjustment again denied the application for a variance, and this decision was never appealed by plaintiffs.

On June 29, 1973, notwithstanding the trial court had not retained jurisdiction, plaintiffs moved in the action to compel the township to issue a building permit for the proposed 520-unit garden apartment complex. At the hearing on the motion, they charged that Ordinance 73–1 failed to "comply" with the court's prior judgment in that although 34 acres were zoned multi-family, in practical terms only 5 acres were available for multi-family construction and the zoning restrictions of the multi-family zone precluded construction meeting the economic and social needs of the area. The trial court agreed with this position, and on July 9, 1973 ordered the township to complete within 60 days "all rezoning required for compliance with the prior Judgment."

Defendants moved for an extension of time on the grounds that the township planning board had recommended adoption of an ordinance rezoning plaintiff's property and that litigation challenging Ordinance 73–1 was pending, but the motion was denied on August 1, 1973.

An appeal from both the July 9, 1973 and January 12, 1973 judgments was filed by the township on August 22, 1973. No timely rezoning having occurred, plaintiffs moved for an order directing the township to issue a building permit to plaintiffs for their proposed multi-family garden apartment complex. In response, the court in October 1973 appointed two planning experts to advise the court on whether Ordinance 73–1 complied with the court's January 1973 judgment, and, if not, to recommend a zoning plan which would so comply.

On January 9, 1974 the experts submitted their report and recommendations. They concluded that Ordinance 73–1 did not comply with the judgment and recommended inclusion of the plaintiffs' tract in the multi-family zone. In addition, they recommended densities in the multi-family zone of at least 6 and up to 9 units per acre. After a hearing on the report the trial court on February 26, 1974 filed an opinion, 131 *N. J. Super.* 195, ordering:

1) The issuance of a building permit to plaintiffs for construction of a two story garden apartment complex upon proper application by plaintiffs to all necessary agencies for site plan review;
2) The "maximum number" (*sic*) of multifamily units permitted plaintiff as a matter of right should be no less than 9 per acre;
3) Certain specified regulatory provisions (*e. g.*, mimimum off-street parking facilities, number of bedrooms, minimum floor area) were attached to plaintiffs' permit.

On February 6, 1974, over objection by both the township and Washington Lakes Association, the court dismissed as of October 30, 1972, without prejudice, the complaint attacking the validity of the private deed restrictions of that Association.

Defendant township filed another appeal from the January 12, 1973 judgment and the July 9, 1973 order, as well as from the February 6, 1974 order. Plaintiffs cross-appealed from the apartment specifications set forth in the court's judgment.

Plaintiffs moved to dismiss those portions of the consolidated appeals seeking to review the January 12, 1973 judgment as beyond the 45-day time limit provided by the rules for appealing a final judgment. The Appellate Division reserved decision on the motion until determination of the entire appeal, and it ultimately denied the motion because of the "public importance" of the judgment.

Pending the appeal herein, this court decided *Mount Laurel* in March 1975. The Appellate Division invited supplemental briefs as to the effect of that ruling on the trial court's determination of the invalidity of the ordinance for failure to zone for multi-family housing. In reversing, the Appellate Division, in an unreported *per curiam* opinion, held that *Mount Laurel* was not applicable, primarily for the reason that that decision was not authoritative except as to developing municipalities — a category not represented by the township. We have concluded that that determination was essentially correct, and affirm to that extent.

I

We direct our attention first to the trial court holding that the ordinance was defective in not providing for multi-family housing. This determination rested on certain essentially undisputed operative facts. The township comprises 1,984 acres or 3¼ square miles. It is one of a group of Bergen County residential communities popularly referred to as the Pascack Valley, of which Washington Township is southernmost. The residential nature of the township is almost exclusively single family, on lots ranging from 5000 sq. ft. to two acres or more. These residences take up 94.5% of the land; commercial uses occupy 3.25%, and there are no industrial or multi-family residential uses (except a few

two-family houses). The remaining 2.3% is vacant land, there being no single parcel larger than that here involved.

The 1970 census population was 10,577, with a projection for 1980 on the master plan (made in 1963) of 10,800. There were in 1970 2,742 dwelling units. The growth of population since 1960 has been rapid, outstripping the rate of increase in surrounding municipalities. Housing density has increased from 41 units per square mile in 1950 to 862 in 1970. The average house was valued at $37,508 in 1970. Most houses are on lots of 75 x 100 feet or 100 x 100 feet, but there are many on half-acre lots and a considerable number larger.

In April 1970, 10% of the total single-family homes were renter occupied. In 1971 Bergen County had approximately 283,700 housing units, of which 90,360, or 31.9%, were rental. This may be compared with 5% for the Pascack Valley region. Five of the eight muniicpalities in the Pascack Valley region have no multi-family units, and the ratio of single-family units to all others is higher in the county than in the State as a whole.

The subject property is the largest undeveloped tract in the township. The plot is roughly rectangular in shape and, except for a few small lots, takes up the whole of the southeast corner of Pascack Road and Washington Avenue, with a total frontage of 774 feet on the former and 370 feet on the latter. On the east the tract abuts a single-family residential area on 7,500 and 10,000 square foot lots. To the west across Pascack Road is a restaurant and a bank followed by single-family residences in both directions. Proceeding west on Washington Avenue near plaintiff's property is a gas station, followed by a small used car lot and another gas station. Going east along Washington Avenue is a municipal firehouse followed by single-family residences. Aside from a vacant 9-acre parcel to the south, the tract mainly abuts single-family homes.

Although the plaintiffs' project has been represented by them at various times to be designed to accommodate middle

to moderate income renters, they firmly took the position at the hearing in January 1974 that if limited to a density of nine units per acre (as provided in the final judgment) they would not be able to provide rental units but only condominiums at a sale price of $50,000. In that event, moreover, there would be approximately 270 rather than 520 units.

## II

Plaintiffs contend the Appellate Division should have dismissed the appeal from the January 1973 order as untimely in view of the trial court having designated it a final judgment. However, the substantive treatment of the subject matter by the trial court after the January 1973 order, its failure to expressly determine that there was "no just reason for delay", see *R.* 4:42-2, and the remand as to the variance issue, all combine to create ambiguity as to the finality of the January 1973 order. See *Application of Tiene,* 19 *N. J.* 149, 161 (1955). In any event, since subsequent orders of the court were appealable and were timely appealed, and the relationship thereto of the earlier order highly germane, we concur in the retention of the appeal by the Appellate Division, for all the reasons stated as well as the public importance of the issues presented.

## III

The determination of the trial court as to invalidity of the ordinance in respect of absence of provision for multi-family housing was based upon the shortage of housing in Bergen County and the Pascack Valley region. The court found this condition operated to create a scarcity of dwelling accommodations affordable by persons, in and out of Washington Township, who needed housing but who were not able to make the average down payment of $8,000, or did not have the $19,000 minimum income requisite to

meet bank standards for a loan needed to purchase the average priced home for sale in the township.

The opinion of the court was that "All segments of the population should have a reasonable choice of living environments to the extent that it is possible * * *"; and that where, as in this part of Bergen County, there is a need for multi-family housing, there is "a statutory requirement to provide as part of a comprehensive plan for a well-balanced community at least some area, however limited it must be under the circumstances present here, where such housing may be constructed." Throughout the opinion zoning not providing for multi-family housing is described as "exclusionary zoning."

The trial opinion and judgment here was rendered prior to this court's determination in *Mount Laurel*, but plaintiffs bring to their aid the thesis that that case supports the trial court's rationale. However, the relevance of *Mount Laurel* here is affected by two important considerations: (1) the population category effectively excluded by the ordinance involved in Mount Laurel — and the class intended to be relieved by our decision therein—was that of persons of low and moderate income; (2) the municipal category subjected to the mandate of the decision was that of the "developing municipality."[1] It required the combined circumstances of the economic helplessness of the lower income classes to find adequate housing and the wantonness of foreclosing them therefrom by zoning in municipalities

---

[1]The heart of the decision was thus rendered:

We conclude that every such [developing] municipality must, by its land use regulations, presumptively make realistically possible an appropriate variety and choice of housing. More specifically, presumptively it cannot foreclose the opportunity of the classes of people mentioned for low and moderate income housing and in its regulations must affirmatively afford that opportunity, at least to the extent of the municipality's fair share of the present and prospective regional and need therefor. [67 *N. J.* at 174.] See also 67 *N. J.* at 188.

in a state of ongoing development with sizeable areas of remaining vacant developable land that moved this court to a decision which we frankly acknowledged as "the advanced view of zoning law as applied to housing laid down by this opinion." 67 *N. J.* at 192.

We have recently reaffirmed and faithfully enforced the principles of *Mount Laurel* in an appropriate fact situation. See *Oakwood at Madison, supra.* But it would be a mistake to interpret *Mount Laurel* as a comprehensive displacement of sound and long established principles concerning judicial respect for local policy decisions in the zoning field. What we said recently in this regard in *Bow & Arrow Manor v. Town of West Orange,* 63 *N. J.* 335, 343 (1973), is worth repeating as continuing sound law:

It is fundamental that zoning is a municipal legislative function, beyond the purview of interference by the courts unless an ordinance is seen in whole or in application to any particular property to be clearly arbitrary, capricious or unreasonable, or plainly contrary to fundamental principles of zoning or the statute. *N. J. S. A.* 40:55-31, 32. It is commonplace in municipal planning and zoning that there is frequently, and certainly here, a variety of possible zoning plans, districts, boundaries, and use restriction classifications, any of which would represent a defensible exercise of the municipal legislative judgment. It is not the function of the court to rewrite or annul a particular zoning scheme duly adopted by a governing body merely because the court would have done it differently or because the preponderance of the weight of the expert testimony adduced at a trial is at variance with the local legislative judgment. If the latter is at least debatable it is to be sustained.

See also *Kozesnik v. Montgomery Twp.,* 24 *N. J.* 154, 167 (1957); *Vickers v. Tp. Com. of Gloucester Tp.,* 37 *N. J.* 232, 242 (1962), *cert.* den. and app. dism. 371 *U. S.* 233, 83 *S. Ct.* 326, 9 *L. Ed.* 2d 495 (1963).

There is no *per se* principle in this State mandating zoning for multi-family housing by every municipality regardless of its circumstances with respect to degree or nature of development. This court confronted a cognate problem in *Fanale v. Hasbrouck Heights,* 26 *N. J.* 320 (1958). We

there reversed a trial court decision invalidating an ordinance prohibiting any further construction of apartment houses in the entire borough. We said (at 325–326):

It cannot be said that every municipality must provide for every use somewhere within its borders. *Duffcon Concrete Products, Inc. v. Borough of Cresskill,* 1 *N. J.* 509 (1949); *Pierro v. Baxendale,* 20 *N. J.* 17 (1955). Whether a use may be wholly prohibited depends upon its compatibility with the circumstances of the particular municipality, judged in the light of the standards for zoning set forth in *R. S.* 40:55–32.

Apartment houses are not inherently benign. On the contrary, they present problems of congestion and may have a deleterious impact upon other uses. *Village of Euclid, Ohio v. Ambler Realty Co.,* 272 *U. S.* 365, 394, 47 *S. Ct.* 114, 71 *L. Ed.* 303 (1926). Accordingly, an ordinance has been upheld although it confined apartment houses to a small portion of the municipality. *Guaclides v. Borough of Englewood Cliffs,* 11 *N. J. Super.* 405 (App. Div. 1951); *Fox Meadow Estates, Inc. v. Culley,* 233 App. Div. 250, 252 *N. Y. S.* 178 (App. Div. 1931), affirmed, 261 *N. Y.* 506, 185 *N. E.* 714 (Ct. App. 1933). And elsewhere it has been broadly said that circumstances may permit a municipality to zone for a single use to retain its residential character. *Valley View Village, Inc. v. Proffett,* 221 *F.* 2d 412 (6 Cir. 1955); *Connor v. Township of Chanhassen,* 249 *Minn.* 205, 81 *N. W.* 2d 789, 795 (Sup. Ct. 1957). No definitive pattern can be judicially prescribed; each case must turn upon its own facts.

While it is true that in *Fanale,* as contrasted with the factual situation here, the municipality already had a substantial number of apartments when the prohibitory ordinance was adopted, the principles enunciated in the foregoing excerpt from *Fanale* are nevertheless pertinent here. It is obvious that among the 567 municipalities in the State there is an infinite variety of circumstances and conditions, including kinds and degrees of development of all sorts, germane to the advisability and suitability of any particular zoning scheme and plan in the general interest. There must necessarily be corresponding breadth in the legitimate range of discretionary decision by local legislative bodies as to regulation and restriction of uses by zoning. The legislative designation of the purposes and criteria of zoning, as set forth in *N. J. S. A.* 40:55–32, is broad and comprehensive,

its most dominant notes being (a) avoidance of undue crowding of uses: *e. g.,* "lessen congestion in the streets; * * * provide adequate light and air; prevent the over-crowding of land or buildings; avoid undue concentration of population * * *"; and (b) consideration of the character of the district and its peculiar suitability for particular uses and encouraging the most appropriate use of land throughout the municipality.[2]

■ Beyond the judicial strictures against arbitrariness or patent unreasonableness, it is merely required that there be a substantial relation between the restraints put upon the use of the lands and the public health, safety, morals, or the general good and welfare in *one or more* of the particulars involved in the exercise of the use-zoning process specified in the statute. *Delawanna Iron and Metal Co. v. Albrecht,* 9 *N. J.* 424, 429 (1952).

■■ Without in any way deprecating the recent salutary judicial, executive and legislative efforts at promoting the construction of multi-family housing to meet an obvious and urgent need therefor, see *Mount Laurel, supra,* 67 *N. J.* at 178–180; *Oakwood at Madison, supra,* 72 *N. J.* at 531–532, 535, there has been no fundamental change, beyond the holding in *Mount Laurel* itself, in the statutory and constitutional policy of this State to vest basic local zoning policy in local legislative officials. *N. J. Const.* 1947, Art. 4 § 6, par. 2; *cf.* Art. 4, § 7, par. 11 (liberal construction of powers of municipal corporations). Thus, maintaining the character of a fully developed, predominantly single-family residential community constitutes an appropriate desideratum of zoning to which a municipal governing body may legitimately

---

[2]The purposes and objects of zoning reflected by the new Municipal Land Use Law, *L.* 1975, *c.* 291 (effective August 1, 1976) *N. J. S. A.* 40:55D–1 *et seq.,* although broadened in several respects, are not essentially dissimilar from those enunciated above. See *N. J. S. A.* 40:55D–2 a., c., e., g., j., 49 a., 52 b. And see *Oakwood at Madison, supra,* 72 *N. J.* at 499.

give substantial weight in arriving at a policy legislative decision as to whether, or to what extent, to admit multi-family housing in such vacant land areas as remain in such a community. *Cf. Village of Belle Terre v. Boraas,* 416 *U. S.* 1, 9, 94 *S. Ct.* 1536, 39 *L. Ed.* 2d 797 (1974); *Fanale v. Hasbrouck Heights, supra,* 26 *N. J.* at 326, quoted above.

Unless there is something in *Mount Laurel,* either directly or by compelling analogy, to persuade otherwise, the long held principles just stated must be controlling here. During the period of development of Washington Township it served a widespread contemporaneous demand of people employed elsewhere for single-family residential housing—a kind of housing traditionally highly valued by the American family —and until fairly recent years affordable by the average family. Such development was characteristic of many communities. It served a basic social and regional need. There was thus nothing invidious about such development or about the decision of the township municipal planners in 1963 to continue that basic scheme of development in order to maintain the established character of the community. Such a determination fully accorded with the statutory criteria of consideration of the character of the municipality and the most appropriate use of land throughout the municipality. As to the potential deleterious zoning effects of emplacing apartment house projects amidst solid single-family development, as here, see *Leimann v. Board of Adjustment, Cranford Tp.,* 9 *N. J.* 336, 341–342 (1952); *Shipman v. Town of Montclair,* 16 *N. J. Super.* 365, 370 (App. Div. 1951). In the same tenor, in part, was the report of the planning experts appointed by the trial court and the testimony of the opposing planning experts herein.

The decision of the municipal legislators, prior to the institution of the present litigation, to keep the municipality free from multi-family development, was, for the reasons stated above, not an arbitrary one, although, concededly, respectable arguments could be mounted for a different policy determination.

Nor is the reasonableness of the municipal residential zoning policy affected by the experimental and defensible zoning decision to try to attract commercial ratables by expanding the permitted uses of some areas, including the instant property, for professional, office and research purposes.[3] See *Gruber v. Mayor and Tp. Com. of Raritan Tp.*, 39 *N. J.* 1, 9–11 (1962); *Mount Laurel, supra,* 67 *N. J.* at 185. Whether that regulation was so factually unjustified as to merit judicial nullification was not decided by the trial court and it is not an issue here.

■ But the overriding point we make is that it is not for the courts to substitute their conception of what the public welfare requires by way of zoning for the views of those in whom the Legislature and the local electorate have vested that responsibility. The judicial role is circumscribed by the limitations stated by this court in such decisions as *Bow & Arrow Manor* and *Kozesnik,* both cited above. In short, it is limited to the assessment of a claim that the restrictions of the ordinance are patently arbitrary or unreasonable or violative of the statute, not that they do not match the plaintiff's or the court's conception of the requirements of the general welfare, whether within the town or the region.

■ The Public Advocate argues that the lesson of *Mount Laurel* and the implications of such decisions as *Sente v. Mayor and Mun. Coun. Clifton,* 66 *N. J.* 204 (1974) and *DeSimone v. Greater Englewood Housing Corp. No. 1,* 56 *N. J.* 428 (1970), are that housing needs of all segments of the population are a priority charge on the zoning regulations of *all* municipalities, whether or not developed. There is no such implication in the cases cited, individually or collectively. None of them stands for the proposition that because of the conceded general shortage of multi-family

---

[3]The zoning amendment placing the *locus in quo* in a 2-acre minimum residential classification is another matter, to be dealt with later herein.

housing the zoning statute has, in effect, been amended to render such housing an absolutely mandatory component of every zoning ordinance — as virtually contended for by plaintiffs and the Public Advocate. In this regard, it is significant that the Legislature has just completed a comprehensive revision of the zoning statute and has made no change approaching the impact of the proposition just stated.[4] See note 2, *supra*, p. 483.

There are allusions in the briefs to approving references in our cases to zoning for an appropriate variety and choice of housing, see, *e. g.*, *Mount Laurel*, 67 *N. J.* at 174, 179, 187, and corollary arguments that such references support the thesis that *all* municipalities must zone for housing for all categories of the population, middle and upper classes as well as low and moderate income. A moment's reflection will suffice to confirm the fact that such references contemplate fairly sizeable developing, not fully developed municipalities— particularly small ones—which may vary in character from such a tiny municipality as Winfield in Union County, developed in a dense, moderate-income, multi-family residential pattern, to one like the subject municipality, homogeneously and completely developed as a middle-upper income, moderate to low density, single-family community. The ideal of the well balanced community, providing all kinds of housing for a cross-section of the regional population pattern, is, quite obviously, realizable physically only in the kind of

---

[4]The only apparent substantive use change in the recent Municipal Land Use Law specifically dealing with housing density is that authorizing "senior citizen community housing construction consistent with provisions permitting other residential uses of a similar density in the same zoning district." *N. J. S. A.* 40:55D–21; 52 g. See *Taxpayers Association of Weymouth v. Weymouth Tp.*, 71 *N. J.* 249, 288–289, 296–297 (1976).

To the extent that it is held in *Windmill Estates, Inc. et al. v. Zoning Board of Adjustment of the Borough of Totowa et al.*, 147 *N. J. Super.* 65 (Law Div. 1976), that anything contained in the Municipal Land Use Law affects or alters the developing municipality criterion of *Mount Laurel*, we disapprove such holding.

developing municipality of sizeable area identified in *Mount Laurel* as such, see 67 *N. J.* at 160, or perhaps in a developed municipality undergoing thorough-going redevelopment of blighted areas.[5]

What Justice Hall probably had in mind, in this regard, when writing for the court in *Mount Laurel, supra,* was foreshadowed when he said, in his noted dissent in *Vickers v. Tp. Com. of Gloucester Tp., supra* (37 *N. J.* at 252, 253)

The instant case, both in its physical setting and in the issues raised, is typical of land use controversies now current in so many New Jersey municipalities on the outer ring of the built up urban and suburban areas. These are municipalities with relatively few people and a lot of open space, but in the throes, or soon to be reached by the inevitable tide, of industrial and commercial decentralization and mass population migration from the already densely settled central cores. *They are not small, homogeneous communities with permanent character already established, like the settled suburbs surrounding the cities in which planning and zoning may properly be geared around things as they are and as they will pretty much continue to be.* (emphasis added).

█ █ We are, of course, not insensitive to the current social need for larger quantities of affordable housing of all kinds for the general population. See *Mount Laurel; Oakwood at Madison, supra,* both *passim; Inganamort, et al. v. Bor. of Fort Lee, et al.,* 62 *N. J.* 521, 527 (1973). A possibility of some relief in that regard is contained within the statutory special exception or variance processes. See *Mount Laurel,* 67 *N. J.* at 181–182, n. 12. But insofar as review of the validity of a zoning ordinance is concerned, the judicial branch is not suited to the role of an *ad hoc*

---

[5]Planning experts Rose and Levin, after applauding the movement in *Mount Laurel* toward zoning requirements for regional housing needs, argue that to "balance" this decision there is needed "an equally forceful judicial expression of the importance of another planning constraint, *i. e.,* the *suitability* of each municipality to accommodate the required housing units". (emphasis the authors'). "What is a 'Developing Municipality' within the Meaning of the *Mount Laurel Decision?*", 4 *Real Est. L. J.* 359, 386 (1976).

super zoning legislature, particularly in the area of adjusting claims for satisfaction by individual municipalities of regional needs, whether as to housing or any other important social need affected by zoning. The closely contested expert planning proofs before the trial court with respect to the utility of the subject tract for various kinds of housing, office and research uses, hospitals and nursing homes, banks and public recreational facilities, is illustrative of the reasonable differences of opinion in this area. We went as far in that general direction as comports with the limitations of the judicial function, in our determinations in *Mount Laurel, supra,* and *Oakwood at Madison, supra.* The sociological problems presented by this and similar cases, and of concern not only to our dissenting brother, but ourselves, call for legislation vesting appropriate developmental control in State or regional administrative agencies. See A. L. I. Model Land Development Code (Proposed Official Draft 1975) Commentary on Article 7, pp. 284–291; Proposed "Comprehensive and Balanced Housing Plan Act", Senate No. 3139 (1977), (Sens. Greenberg, Merlino and McGahn); *cf. Oakwood at Madison, supra,* 72 *N. J.* at 499, 531–532. The problem is not an appropriate subject of judicial superintendence. Clearly the legislature, and the executive within proper delegation, have the power to impose zoning housing regulations on a regional basis which would ignore municipal boundary lines and provide recourse to all developable land wherever situated, *Oakwood at Madison, ubi cit. supra.* Nothing in this opinion, contrary to the assertion in the dissent (pp. 513–514), is calculated to preclude that salutary course.

 We concur in the Appellate Division judgment setting aside the trial court adjudication of illegality of the Washington ordinance for failure to zone for multi-family residential use.

This conclusion renders it unnecessary to deal with the orders of the trial court enforcing that determination, *i. e.,* the appointment of experts in aid of the court's judgment

and the remedy of ordering the grant of a building permit to the plaintiffs. Those actions of course fall with the setting aside of the underlying adjudication by the trial court.

## IV

As seen above, the judgment[6] of the trial court held the 1967 ordinance amendment, increasing minimum lot requirements of the subject property from 10,000 square feet to two acres, to be invalid. In this regard the trial court determination was articulated as follows:

With due regard for the presumptive validity of local zoning action it is readily apparent that the two-acre residential requirement of Ordinance 67-3 is beyond the permissible reach of the zoning power in this instance. The power to zone is not unlimited, but must in the first instance conform to the statutory requirements prescribed by the legislature in *N. J. S.* 40:55-32. Thus, at a minimum the zoning power must be exercised "in accordance with a comprehensive plan" (*ibid.*) so as

"* * * to prevent a capricious exercise of the legislative power resulting in haphazard or piecemeal zoning." *Kozesnik v. Montgomery Twp.*, *supra* at 166.

The comprehensive plan requirement was obviously ignored when the Township increased the minimum lot size for residential use of this property more than eight fold — from 10,000 square feet to two acres. There is nothing in the record here or in the zoning ordinance itself to indicate that the amendment in question was anything more than "haphazard or piecemeal zoning". The minutes of the Township Committee and the Planning Board do not disclose any reason for or purpose to be served by the amendment, except for a statement by a member of the planning Board that any residential development of this property should be prohibited.

The imposition of a two-acre minimum for residential use would appear to have been a reflex response to the filing of an application by Waldy for a subdivision of the property and its evident purpose was not to further a comprehensive zoning plan but to inhibit plain-

---

[6]The language of the judgment is broad enough to invalidate the 2-acre minimum lot requirement for commercial as well as residential purposes. However, the court's opinion did not deal with the former aspect of the zoning, no argument with respect thereto is pursued by plaintiffs on the appeal, and we are assuming the effect of the judgment is confined to residential uses.

tiffs' development of the property for residential use. It should be noted that the lowest residential density otherwise required under the Township's zoning ordinance is one acre, and that is reserved for a relatively limited area of the community in the extreme northwest corner. Plaintiffs' property, on the other hand, is substantially surrounded by existing residential development on lots containing 10,000 square feet or less. It shares the same physical characteristics as the neighboring properties, and the defendant has not offered any evidence to show that there was a rational basis for imposing such drastically different and discriminatory density requirements for the subject property.

Support for this conclusion is also found in the Master Plan adopted less than four years before the enactment of this amendment to the zoning ordinance. While a Master Plan is not "necessarily synonymous" with the comprehensive plan required by statute, *see Johnson v. Twp. of Montville*, 109 *N. J. Super.* 511, 520 (App. Div. 1970), it is certainly suggestive of a municipality's long-range zoning plan and the objectives to be realized through zoning. Here, the Master Plan contained no hint or suggestion that the characteristics of the plaintiffs' property were such as to require a different density use treatment than the lands surrounding it. Indeed, the Plan recommended that it be accorded the same zoning restrictions with respect to density as existed before the Plan and in keeping with the zoning of the neighboring tracts. The sudden shift to two-acre residential zoning in the context found here cannot be sustained under our statutory or decisional law. As applied to the factual conditions of the present case, Ordinance 67–3 is arbitrary and discriminatory, and it bears no substantial relationship to the purposes of zoning set forth in *N. J. S.* 40:55–32. It is therefore invalid. *Zampieri v. River Vale Tp.*, 29 *N. J.* 599 (1959) ; *Roselle v. Wright*, 21 *N. J.* 400 (1956) ; *Katobimar Realty Co. v. Webster*, 20 *N. J.* 114 (1955) ; *Scarborough Apartments, Inc. v. City of Englewood*, 9 *N. J.* 182 (1952).

The Appellate Division opinion did not deal with this issue.[7] We are satisfied that in this regard the trial court was eminently right, and we modify the Appellate Division judgment to the extent of affirming that portion of the judgment for the reasons expressed by the court, as quoted above. We add to the cases cited by it *Schere v. Township*

---

[7]Although the notice of appeal by the township was from the whole of the trial court judgment, its brief "inadvertently" did not address the issue. Its reply brief does so, however, and we think it well to dispose of the question on the merits.

*of Freehold,* 119 *N. J. Super.* 433 (App. Div.) certif. den. 62 *N. J.* 69 (1972), *cert.* den. 410 *U. S.* 931, 93 *S. Ct.* 1374, 35 *L. Ed.* 2d 593 (1973).

Under all the circumstances, it appears just that the invalidation of the 2-acre requirement be attended by a revival of the former 10,000 square foot minimum zoning for the property in question in relation to residential one-family development. We so hold. This is subject, of course, to any valid subsequent rezoning of the property by the township.

## V

██ Both the township and the Washington Lakes Association question the propriety of the trial court ordering issuance of a building permit in this case without first adjudicating on its merits plaintiffs' amended complaint that the deed restrictions affecting part of the property were invalid. Instead, the court dismissed the amended complaint in that respect without prejudice. The appropriateness of that action may be questioned. See *Vacca v. Stika,* 21 *N. J.* 471, 476 (1956). However, with our vacation of the court's order directing issuance of a building permit for garden apartments, the deed restriction issue appears to have become moot. Moreover, neither plaintiffs nor the Association, who are the only parties in interest on the matter, have appealed from the trial court dismissal of the amended complaint. The question is consequently not before us.

## VI

The township filed a motion prior to argument herein to dismiss the appeals as moot. This was based on the following facts. The complaint of plaintiff Pascack, a limited partnership, raised only the validity of the OR zoning and of the two-acre zoning limitation, not the contention of invalidity of the ordinance in relation to absence of zoning for multi-family housing. The latter position was taken

in the complaint of plaintiff Waldy only. In the meantime, title to the tract was transferred from Pascack to 3201 and 3202 Associates, Inc., and subsequently back to Pascack by the latter corporation. The township argues that since Pascack, the sole owner and party in interest, has obtained the relief it sought, it no longer has an interest in the controversy; and that no one remains in the case with an interest in the contention raised by the now-absent Waldy or in the consequent judgment.

The first of the latter assertions is clearly unfounded since the township has appealed the issue of the two-acre zoning. As to the second argument, we deem it hypertechnical. In a real sense, the ultimate judgment of the court on the issue raised by Waldy, i. e., ordering the issuance of a building permit for the property, redounded to the benefit of the owner of the property, whoever that might be. Thus, having in mind also the joinder of the actions below and the public importance of a final resolution of all the issues by this court, we deny the motion.

Judgment modified in accordance with this opinion. No costs, but the order of the trial court with respect to defrayal of costs of the report of the experts is to stand.

SULLIVAN, J. (concurring). I am in general agreement that this is not a *Mount Laurel* case for two reasons. First, the Township of Washington is not a developing municipality. Second, the proposed housing is not for low or moderate income families. The trial judge, while he properly struck down the 1967 amendment to the zoning ordinance which increased the minimum lot requirements of the property in question from 10,000 square feet to two acres, unnecessarily became enmeshed in rezoning in order to allow for multi-family housing on plaintiff Waldy's 30-acre tract of land.

I recognize that where there is a need for a particular type of conventional housing in an area, such as multi-family housing, a municipality in that area has some obligation

as to that need, provided it has land available and suitable for such use, and provided its overall zone plan and the public good are not adversely affected to a substantial extent. This is so even though, as here, the municipality may be largely developed on a single-family residence basis with only 2.3% of its area remaining vacant land. The solution lies in meaningful utilization of the statutory special exception or variance processes. Indeed, I would hold that a demonstrated need for a particular type of conventional housing would constitute a special reason authorizing the grant of a variance, provided the negative criteria of the statute are satisfied.[1]

This case points up the inherent weakness in the present statutory provisions which, with few exceptions, vest exclusive control over zoning in the particular municipal government. Pascack Valley is a typical example. There is an admitted need for multi-family housing in this area yet five of the eight municipalities in the Valley do not permit this type of housing unit. However, if you consider each one of these municipalities separately, some basis can be demonstrated for the particular zone plan. Until regional zoning is established based on comprehensive planning, the problems we are now grappling with cannot be resolved except on an *ad hoc* basis.

I am constrained to add the following. Our decision in *Mount Laurel* and its progeny admittedly deal with difficult and far-reaching problems involving the public welfare. I wonder, though, if the opinions we are handing down in this area of the law of zoning have not become so complicated that they are beyond the comprehension of the average member of a local planning board, board of adjustment or governing body (not to mention many members of the bench and bar). In directing local government as to how

---

[1] An application for a variance was made in this case. However, it was ultimately denied and this decision was not appealed by plaintiffs.

it must exercise its zoning power pursuant to law, it is essential that we speak with more clarity, directness and simplicity.

I join in the modification of the Appellate Division judgment and the affirmance of that judgment as modified.

SCHREIBER, J., concurring. The *Mt. Laurel*[1] principle, as I view it, of prohibiting a municipality from utilizing its zoning power to exclude low and moderate income families in order to escape an adverse financial impact, should be applicable to *all* municipalities. *See Oakwood at Madison, Inc. v. Madison Tp.,* 72 *N. J.* 481, 619 (1977) (Schreiber, J., concurring).[2] Equitably I cannot envision any sound policy which would justify a differentiation in the *duty* owed by a developing or a fully developed community. If a municipality, motivated by fiscal reasons, has zoned to exclude low and moderate income people and has successfully accomplished that end, contrary to the general welfare, the courts should not absolve that municipality from its underlying duty simply because it has already completed its illegal objective.

The fact that a settled and developed community may not have any vacant or undeveloped land does not and should not bar fulfillment of that obligation once it is found that the zoning has been enacted with fiscal considerations in mind. As soon as the wrong is adjudicated, the municipality must rezone. The municipality's duty, as Justice Hall stated in *Mt. Laurel,* would be satisfied if its zoning afforded the *opportunity* for low and moderate income housing. 67 *N. J.* at 174 and 179. Although rezoning undeveloped land for this purpose may be desirable, developed acreage

---

[1] *Southern Burlington County N.A.A.C.P. v. Mt. Laurel Tp.,* 67 *N. J.* 151, appeal dismissed and *cert.* denied, 423 *U. S.* 808, 96 *S. Ct.* 18, 46 *L. Ed.* 2d 28 (1975).

[2] The majority recognizes, as I have previously indicated in *Oakwood,* that the intent of *Mt. Laurel* was to relieve the housing needs "of persons of low and moderate income." 74 *N. J.* at 480.

may likewise be utilized. In each of these developed communities there appear to be some vacant tracts, and, in addition, some sections may be ripe for redevelopment. Irrespective of sufficient vacant land and areas in need of redevelopment, the municipality should rezone whatever area is needed to permit the construction of low and moderate income housing, even though those projects may not become economically feasible until sometime in the future. In this manner, the municipality will acquit its obligation.

However, the enactment of zoning ordinances in some municipalities, such as in the Township of Washington, was not motivated by fiscal considerations. As Judge Conford suggests, the Township adopted its ordinance for reasons consistent with *N. J. S. A.* 40:55–32, "its most dominant notes being ,(a) avoidance of undue crowding of uses: *e. g.,* 'lessen congestion in the streets; . . . provide adequate light and air; prevent the overcrowding of land or buildings; avoid undue concentration of population . . .'; and (b) consideration of the character of the district and its peculiar suitability for particular uses and encouraging the most appropriate use of land throughout the municipality." 74 *N. J.* at 483. He points out that "[d]uring the period of development of Washington Township it served a widespread contemporaneous demand of people employed elsewhere for single-family residential housing — a kind of housing traditionally highly valued by the American family — and until fairly recent years affordable by the average family." 74 *N. J.* at 484. Its initial zoning ordinance in 1941 encouraged construction of single-family homes, and the 1963 master plan recognized the municipality had and was "predominantly developed" as a single-family community. Thus we find that the invidious motive condemned by *Mt. Laurel* is non-existent and its principle inapplicable.

I concur and join in the judgment as modified by the majority.

*Outline of Dissenting Opinion*

I Defining the Duty to Provide for Regional Needs 496

II Limiting Obligations Under *Mt. Laurel* to "Developing" Communities 503

III Practical Effect of the Majority Decision 505

IV Applying an Affirmative Obligation to "Developed" Communities 516

V Conclusion 517

PASHMAN, J., dissenting. The majority's decision restricts to "developing" communities the affirmative obligation to provide for regional housing needs. By allowing municipalities without sizeable land areas or significant available open spaces to ignore regional demands for multi-family housing, the Court extends its tacit approval to exclusionary zoning practices. In doing so, it disregards the intent and spirit of our decision in *So. Burlington Cty. NAACP v. Tp. of Mt. Laurel*, 67 *N. J.* 151 (1975), *cert.* den. and appeal dismissed, 423 *U. S.* 808, 96 *S. Ct.* 18, 46 *L. Ed.* 2d 28 (1975), which we recently reaffirmed in *Oakwood at Madison, Inc. v. Tp. of Madison*, 72 *N. J.* 481 (1977) (hereinafter *"Madison Tp."*). The majority's decision permits a significant number of communities to horde what may be the State's most precious scarce resource: available developable land. For the reasons set forth below, I dissent.

J

## DEFINING THE DUTY TO PROVIDE FOR REGIONAL NEEDS

Two years ago this Court decided the landmark case of *So. Burlington Cty. NAACP v. Tp. of Mt. Laurel, supra* (hereinafter *"Mt. Laurel"*). That decision followed attempts by various courts to deal with exclusionary zoning by

attacking specific exclusionary planning techniques.[1] *See, e. g., Appeal of Kit-Mar Builders, Inc.*, 439 *Pa.* 466, 268 *A.* 2d 765 (Sup. Ct. 1970) (invalidating two to three acre minimum lot size requirements); *Appeal of Girsh*, 437 *Pa.* 237, 263 *A.* 2d 395 (Sup. Ct. 1970) (invalidating *de facto* ban on apartment buildings); *Nat'l Land & Inv. Co. v. Easttown Tp. Bd. of Adjustment*, 419 *Pa.* 504, 215 *A.* 2d 597 (Sup. Ct. 1965) (striking down four acre minimum lot size requirements); *Molino v. Mayor and Council of Bor. of Glassboro*, 116 *N. J. Super.* 195 (Law Div. 1971) (holding unconstitutional bedroom restrictions designed to restrict population). Rather than continue with piecemeal solutions, the Court in *Mt. Laurel* ordered developing municipalities to respond affirmatively to regional needs for multi-family housing. Justice Hall, speaking for a unanimous Court, held:

> [E]very such municipality must, by its land use regulations, presumptively make realistically possible an appropriate variety and choice of housing. More specifically, presumptively it cannot foreclose the opportunity of the classes of people mentioned for low and moderate income housing and in its regulations must affirmatively afford that opportunity, at least to the extent of the municipality's fair share of the present and prospective regional need therefor. These obligations must be met unless the particular municipality can sustain the heavy burden of demonstrating peculiar circumstances which dictate that it should not be required so to do.
>
> [67 *N. J.* at 174; footnote omitted.]

In *Madison Tp.* this Court reaffirmed its belief in the necessity of requiring affirmative action on the part of municipalities to meet regional housing needs. Accordingly, in order to determine whether the ordinance in Madison Township was exclusionary in character, the Court considered whether or not it "operate[d] in fact to preclude the opportunity to supply any substantial amounts of new housing

---

[1] For a summary of the problems inherent in exclusionary zoning, see *Madison Tp.*, 72 *N. J.* at 556–559 (Pashman, J., concurring and dissenting).

for low and moderate income households now and prospectively needed in the municipality and in the appropriate region of which it forms a part." 72 *N. J.* at 497. Primarily on the ground that the community had zoned the bulk of its available developable land for one and two acre family residences, this court upheld the finding of the lower court that the ordinance "ignored the housing needs of the township and the region, and failed 'to promote reasonably a balanced community in accordance with the general welfare.'" 72 *N. J.* at 492.

The emphasis on meeting regional needs in *Mt. Laurel* and *Madison Tp.* was based on the well-established principle that zoning enactments must benefit the public, health, safety, morals or the general welfare. *See, e. g., Roselle v. Wright,* 21 *N. J.* 400, 408–10 (1956). In determining what served the general welfare, in *Mt. Laurel* and *Madison Tp.,* we placed primary emphasis on meeting the critical need for housing in the respective regions in which the defendant municipalities were located, and *not* on local fiscal pressures or social considerations. In *Mt. Laurel* Justice Hall stated:

> It is plain beyond dispute that proper provision for adequate housing of all categories of people is certainly an absolute essential in promotion of the general welfare required in all local land use regulation. Further the universal and constant need for such housing is important and of such broad public interest that the general welfare which developing municipalities like Mount Laurel must consider extends beyond their boundaries and cannot be parochially confined to the claimed good of the particular municipality. It has to follow that, broadly speaking, the presumptive obligation arises for each such municipality affirmatively to plan and provide, by its land use regulations, the reasonable opportunity for an appropriate variety and choice of housing, including, of course, low and moderate cost housing, to meet the needs, desires and resources of all categories of people who may desire to live within its boundaries. Negatively, it may not adopt regulations or policies which thwart or preclude that opportunity.
>
> [67 *N. J.* at 179–80.]

Rather than sacrifice the development of multiple-family housing for low and middle income people in the interests of a

more favorable tax base, the Court noted that municipalities would have to seek tax relief from other branches of government. See 67 *N. J.* at 186.

In *Mt. Laurel* the Court reviewed the statutory and constitutional basis for requiring zoning which conformed to a regional view of the general welfare. Although regional zoning can also be justified on the basis of sound planning principles, this Court was necessarily guided by statutory and constitutional considerations in holding that a community must recognize and serve the welfare of the state's citizens beyond its own particular municipal boundaries. *Mt. Laurel, supra,* 67 *N. J.* at 177. Relying on cases involving the zoning of facilities which were of broad public benefit, we noted the importance of "values which transcend municipal lines" in determining the general welfare. 67 *N. J.* at 178, citing *Roman Catholic Diocese of Newark v. Ho-Ho-Kus Borough,* 47 *N. J.* 211 at 218 (1966). *See also, Kunzler v. Hoffman,* 48 *N. J.* 277, 288 (1966) ("general welfare . . . comprehends the benefits not merely within municipal boundaries but also those to the regions of the State relevant to the public interest to be served").

We also concluded in *Mt. Laurel* that the zoning enabling legislation, *N. J. S. A.* 40:55–30, specifically required zoning which anticipated regional needs. Although the Legislature revised the zoning statute by enacting the "Municipal Land Use Law," *L.* 1976, *c.* 291, effective August 1, 1976, we held in *Madison Tp.* that the new statute also required a regional approach in determining the general welfare. 72 *N. J.* at 496. The new law specifically provides for land use planning which will best satisfy the general welfare of all citizens of the State. Section 2 of the Act, stating the intent and purpose of the new legislation, provides in pertinent part:

a. To encourage municipal action to guide the appropriate use or development of *all* lands in this State, in a manner which will promote the public health, safety, morals, and general welfare;

\* \* \* \* \* \* \* \*

d. *To ensure that the development of individual municipalities does not conflict with the development and general welfare of neighboring municipalities, the county and the State as a whole;*

e. To promote the establishment of appropriate population densities and concentrations that will contribute to the well-being of persons, neighborhoods, communities and *regions* and preservation of the environment;

\* \* \* \* \* \* \* \*

g. To provide sufficient space in appropriate locations for a variety of agricultural, residential, recreational, commercial and industrial uses and open spaces, both public and private, according to their respective environmental requirements in order *to meet the needs of all New Jersey citizens.*

[Emphasis added.]

The clear intent of the new statute is to implement the broad definition of the general welfare enunciated in *Mt. Laurel* by requiring *all* zoning enactments to be based on regional concerns.[2]

The new legislation is consistent in all respects with our State Constitution, which requires adherence to a rational approach to land use planning based on a regional perspective. *See Madison Tp., supra* 72 *N. J.* 496; *Mt. Laurel, supra,* 67

---

[2] The Court's decision today should not be read as foreclosing an argument that the new statute, which became effective August 1, 1976, goes beyond even our holding in *Mt. Laurel. See Windmill Estates v. Zoning Bd. of Adjustment of Totowa,* 147 *N. J. Super.* 65 (Law Div. Dec. 17, 1976). The complaints in this case were filed on September 28, 1970 by Pascack Association Limited, and on August 13, 1971 by Waldy, Inc. Because all arguments have been directed to the zoning statute then in force and to the applicability of our decision in *Mt. Laurel,* any references to the new Act must be regarded as *dicta.* Nevertheless, it should be noted that one of the purposes of the new act, as enunciated in the sponsor's statement, is "broadening the statutory municipal purposes of zoning, planning and land use control, . . . ." Additionally, since the new law was passed after our decision in *Mt. Laurel,* it must be presumed to have been passed with knowledge of that holding. *Barringer v. Miele,* 6 *N. J.* 139, 144 (1951); *In Re Keogh-Dwyer,* 45 *N. J.* 117, 120 (1965). Although the legislation clearly reflects the broad definition of the general welfare which we enunciated in *Mt. Laurel,* it makes no reference, either explicitly or implicitly, to any exemption for communities which are "developed."

*N. J.* at 175. "The basic importance of housing and local regulations restricting its availability to substantial segments of the population" impelled us in *Mt. Laurel* to conclude that a zoning ordinance which failed to provide for regional housing needs would violate the state constitutional requirements of equal protection and due process as found in Art. I, ¶ 1.[3] 67 *N. J.* at 174–75.

Yet as the majority correctly indicates, ante at 481–482, we have never adopted a requirement that all communities, regardless of their unique circumstances, be required to accept unlimited multi-family housing. Instead, we have specifically limited each community's obligation to a "fair share" of the regional housing need. 67 *N. J.* at 188, 189. Recognizing the inherent limitations of judicially imposed zoning mandates, I wrote in *Mt. Laurel*:

> While municipalities must plan and provide for regional housing needs, no municipality need assume responsibility for more than its fair share of these needs. The purpose of land use regulation is to create pleasant, well-balanced communities, not to recreate slums in new locations. It is beyond dispute that when the racial and socioeconomic composition of the population of a community shifts beyond a certain point, the white and affluent begin to abandon the community. While the attitudes underlying this "tipping" effect must not be catered to, the phenomenon must be recognized as a reality.
>
> [67 *N. J.* at 212; Pashman, J., concurring.]

Rather than call for uncontrolled growth, we advocated planning to anticipate regional demand. Only in this manner could municipalities avoid future overcrowding and cope with the urban slums and suburban sprawl which had resulted from the absence of such controls.

---

[3] The paragraph reads:

> All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

Despite the clear directive in *Mt. Laurel* to affirmatively require municipalities to provide for their "fair share" of regional housing needs, the majority today retreats from its constitutional duty, relying on the statutory delegation of decision-making power to the municipalities. The majority opinion states:

> But the overriding point we make is that it is not for the courts to substitute their conception of what the public welfare requires by way of zoning for the views of those in whom the Legislature and the local electorate have vested that responsibility.
>
> [At 485.]

While the majority correctly states one of the fundamental precepts of law limiting this Court's power to review local decision-making power, its over-simplification of the problem results in the misapplication of the above principle to the instant case.

Though the State Legislature may have vested the *power* in Washington Township and Demarest to determine the general welfare, it was constitutionally barred from granting those communities the *right* to ignore the welfare of citizens not living within their municipal boundaries. We underscored this principle in *Mt. Laurel* when we stated:

> [I]t is fundamental and not to be forgotten that the zoning power is a police power of the state and the local authority is acting only as a delegate of that power and is restricted in the same manner as is the state. So, when regulation does have a substantial external impact, *the welfare of the state's citizens beyond the borders of the particular municipality cannot be disregarded and must be recognized and served.*
>
> [67 *N. J.* at 177; emphasis added.]

*See also, Roselle v. Wright, supra,* 21 *N. J.* at 408–10; *Kato-bimar Realty Co. v. Webster,* 20 *N. J.* 114, 122–23 (1955); *Schmidt v. Board of Adjustment of Newark,* 9 *N. J.* 405, 413–19 (1952); *Collins v. Board of Adjustment of Margate City,* 3 *N. J.* 200, 206 (1949). This basic principle was recognized by Mr. Justice Sutherland when first upholding

the constitutionality of zoning in *Village of Euclid v. Ambler Realty Co.*, 272 *U. S.* 365, 390, 47 *S. Ct.* 114, 119, 71 *L. Ed.* 303, 311 (1926), where he noted *"* * * the possibility of cases where the general public interest would so far outweigh the interest of the municipality that the municipality would not be allowed to stand in the way."* [Emphasis added.]

## II

### LIMITING OBLIGATIONS UNDER MT. LAUREL TO "DEVELOPING" COMMUNITIES

The Court in *Mt. Laurel* limited its discussion to "developing communities." As a consequence, the Court's decision was taken by some to excuse communities which could be characterized as "developed" from the affirmative duty to provide for regional housing needs. I have repeatedly criticized this proposition as being inconsistent with the spirit of that decision and an impediment to any attempt at requiring affirmative action to counteract exclusionary zoning. *Mt. Laurel,* 67 *N. J.* at 208–09, 217–18 ,(Pashman, J., concurring). Today, four members of the Court have indicated their desire to prolong the "developed-developing" distinction, thereby seriously impairing the ability of the Court to continue seeking broad solutions to the problem of exclusionary zoning. I would apply the dictates of *Mt. Laurel* to *all* municipalities, and therefore welcome the endorsement ΄of this view by Mr. Justice Schreiber and Mr. Justice Sullivan. See *ante* at 494 (Schreiber, J., concurring), *ante* at 492 (Sullivan, J., concurring).

The Court in *Mt. Laurel* defined "developing communities" as those municipalities which have "sizeable land area outside the central cities and older built-up suburbs of our North and South Jersey metropolitan areas (and surrounding some of the smaller cities outisde those areas as well)." 67 *N. J.* at 160. Additionally, the Court noted that under its definition of "developing communities," such municipalities

have "substantially shed rural characteristics and have undergone great population increase since World War II, or are now in the process of doing so, but still are not completely developed and remain in the path of inevitable future residential, commercial and industrial demand and growth." *Id.* The Court today applies this definition by granting Washington Township and the Town of Demarest immunity from any affirmative obligation to plan and provide for low and moderately priced housing. Insofar as it affirms the trial court's order striking down two acre minimum lot size requirements, the majority indicates its limited willingness to police exclusionary land use controls.

The majority's application of the *Mt. Laurel* definition of "developing communities" to Washington Township and Demarest demonstrates a willingness on the part of the Court to adhere to a restrictive interpretation of the *Mt. Laurel* decision. Both communities are physically small; Washington Township comprises three and one-quarter square miles and Demarest amounts to less than two and one-half square miles in area. Both are located in densely populated Bergen County, adjacent to New York City. Consequently, under a literal interpretation of the *Mt. Laurel* definition of "developing communities," both municipalities might be considered to have no "sizeable land area outside the . . . older built-up suburbs." They would both be considered "developed" under either of two interpretations: (1) they have no sizeable land area at all, and (2) they are completely situated within the older built-up suburban area which completely surrounds the New York City-Newark Metropolitan area. Under the former interpretation, most of northeastern New Jersey might also be considered developed; under the latter, a court could conceivably conclude that the major portion of the entire state was intended to be excluded from *Mt. Laurel. Cf., Urb. League New Bruns. v. Mayor & Coun. Carteret,* 142 *N. J. Super.* 11, 21 (1976) (finding that "Middlesex County is part of the New York metropolitan region").

The majority decision fails to provide lower courts with a workable definition of "developing communities." In describing its application of the *Mt. Laurel* definition to the facts in Washington Township and Demarest, the majority expands rather than contracts the number of communities which might have a basis for claiming to be "developed":

> . . . sizeable, developing, not fully developed municipalities — particularly small ones — which may vary in character from such a tiny municipality as Winfield in Union County, developed in a dense, moderate-income, multi-family residential pattern to one like the subject municipality, homogeneously and completely developed as a middle-upper income, moderate to low density, single-family community.
>
> [At 486.]

As a result, the majority's definition can only add to the litigation which has surrounded the term "developing communities." In addition to the instant litigation and that in the companion case, *Fobe Associates v. Mayor and Council & Bd. of Adjustment of the Borough of Demarest*, 74 *N. J.* 519, see, for example, *Nigito v. Borough of Closter*, 142 *N. J. Super.* 1 (App. Div. 1976) ; *Segal Construction Co. v. Wenonah Zoning Bd. of Adjustment*, 134 *N. J. Super.* 421 (App. Div. 1975) ; *Urb. League New Bruns. v. Mayor & Coun. Carteret*, 142 *N. J. Super.* 11 (Ch. Div. 1976) ; and unreported cases discussed in Rose, "From the Courts: The Trickle Before the Deluge from *Mount Laurel*," 5 *Real Estate Law Journal* 69 (1976).

## III

### PRACTICAL EFFECT
### OF THE MAJORITY DECISION

The Court's characterization of some communities as "developed" allows municipalities which have already attained "exclusionary bliss" to forever absolve themselves of any obligation for correcting the racial and economic segregation which their land use controls helped to create. By re-

warding the past unlawful use of the zoning power to accomplish racially and economically discriminatory planning, we encourage future abuse of land use planning controls. The existence of developed, insular communities which are allowed to reap the benefits of their illegality without being required to share in the costs is a constant reminder to developing communities of the benefits to be gained from illegal and exclusionary zoning. Similarly, remaining communities and inner cities will be required by today's decision to take more than their "fair share" of low and middle-income multi-housing; that specter can only encourage municipalities to avoid the label of "developing."

The most damaging result of today's decision is its abandonment of the innovative spirit of *Mt. Laurel.* First, in place of considerations aimed at determining whether or not a community can effectively cope with additional multi-family housing, the majority lays down a blanket exemption for municipalities solely on the basis of physical size. While in *Mt. Laurel* we were concerned with "over-intensive and too sudden development" which our decision might have produced, 67 *N. J.* at 191 and 67 *N. J.* at 212 (Pashman, J., concurring), and with ecological and environmental effects, 67 *N. J.* at 186, the majority now concludes that preserving the character of a community is more important than providing solutions for the problems created by exclusionary zoning.

Washington Township illustrates the unfortunate results of the majority's obsession with preserving the character of the community, even if at the expense of the general welfare. Planning experts appointed by the trial court concluded that even within the Township, young married couples and older couples with grown children living elsewhere, represent a sizeable need for multi-family housing. Additionally, the planning experts noted the regional need for housing:

The failure of the Township to make provision for moderate rental apartments would not be serious if such units were available elsewhere in the surrounding Pascack Region. Such is not the case.

The failure to meet public need for this type of housing is general. Communities in the Region and in Bergen County have enacted land use controls which effectively limit their regional role to serving as single family residential dormitories for middle and upper income families.

Moreover, the majority ignores the findings of the court appointed planning experts that Washington Township would not be detrimentally affected by the proposed multi-family development:

Proposed large scale apartment development in other communities may pose difficult problems but it seems clear that Washington Township can absorb a modest amount of middle income apartment development without suffering damage to the community's social fabric and its amenities. Moreover, if such development is properly planned and controlled, it should not only remain physically and socially stable but should contribute significantly to the housing needs of the community.

The experts pointed out that Washington Township's schools are presently under-utilized and that existing roadways would not be adversely affected by the proposed development. In fact, apartment development would have produced a smaller volume of peak hour traffic than the office-research facilities for which the property is presently zoned.[4]

Second, by determining whether a community is "developed" on the basis of its physical size, the majority re-

---

[4] *Mt. Laurel* clearly envisioned that a community which is not developed for the purposes of encouraging future employment growth would be required to provide housing to meet the needs of persons who are encouraged to work in and around that community. The Court stated: "[c]ertainly when a municipality zones for industry and commerce for local tax benefit purposes, it without question must zone to permit adequate housing within the means of the employees involved in such uses." 67 *N. J.* at 187. Yet the majority encourages Washington Township to disregard *Mt. Laurel;* despite its cries that Washington Township cannot accommodate additional housing, the community's current zoning anticipates office and research facilities which also burden municipal facilities. Washington Township is an example of an attempt to extract the benefits of growth while avoiding any incidental burdens.

turns to evaluating the general welfare on the basis of a municipality's territorial limits — a methodology which this Court has consistently rejected. Chief Justice Vanderbilt commented on the impropriety of this type of analysis in *Duffcon Concrete Products, Inc. v. Borough of Cresskill,* 1 *N. J.* 509 (1949), when he said:

What may be the most appropriate use of any particular property depends not only on all the conditions, physical, economic and social, prevailing within the municipality and its needs, present and reasonably prospective, but also on the nature of the entire region in which the municipality is located and the use to which the land in that region has been or may be put most advantageously. *The effective development of a region should not and cannot be made to depend upon the adventitious location of municipal boundaries, often prescribed decades or even centuries ago, and based in many instances on considerations of geography, of commerce, or of politics that are no longer significant with respect to zoning.* The direction of growth of residential areas on the one hand and of industrial concentration on the other refuses to be governed by such artificial lines. Changes in methods of transportation as well as in living conditions have served only to accentuate the unreality in dealing with zoning problems on the basis of the territorial limits of a municipality.

[1 *N. J.* at 513; emphasis added.]

*See also, Kunzler v. Hoffman,* 48 *N. J.* 277, 288 (1966); *Roman Catholic Diocese of Newark v. Ho-Ho-Kus Borough, supra,* 42 *N. J.* at 566; *Borough of Cresskill v. Borough of Dumont,* 15 *N. J.* 238, 247–49 (1954). Additionally, in *Mt. Laurel* we recognized "[i]t is now clear that the Legislature accepts the fact that at least land use *planning,* to be of any value, must be done on a much broader basis than each municipality separately." 67 *N. J.* at 189, n. 22.

The inadequacies of a system of land use planning which apportions the task of accomplishing regional zoning among many different component municipalities are accentuated where the Court orders an affirmative response to housing problems, yet exempts a significant number of these communities from any responsibility. Though calling for a legislative response to the problem, Justice Mountain, concurring and dissenting in *Madison Tp.,* noted the unsatisfac-

tory nature of relying solely on "developing" communities
and municipal boundaries to accomplish regional zoning:

> \* \* \* Any municipality in the State is at liberty to adopt a zoning
> ordinance or plan of land use regulation, and presumably most have
> done so. Of these municipalities a goodly number must surely
> qualify — albeit reluctantly — as 'developing.' Their land use plans
> are therefore required to meet the test of *Mt. Laurel.* But it must
> be obvious that the housing needs with which we are concerned can
> be better met in some municipalities within a region than in others.
> *From a purely rational point of view, it makes little sense to ap-
> portion the regional obligation, willy-nilly, among some number of
> diverse political entities, set off from one another by boundary lines
> placed where they are by historical accident.* \* \* \* \*
> Any comprehensive review of our zoning problems should take
> account of a state-wide or regional allocation of zoning power as a
> possibly preferable alternative to present arrangements.
>
> > [*Madison Tp.*, 72 *N. J.* at 629–
> > 630 (Mountain, J., concurring and
> > dissenting) ; emphasis added.]

In spite of the repeated criticisms rejecting strict adherence
to municipal boundaries as a determinant of zoning policy,
the Court today returns to that discredited approach.

The Court's decision will have a dramatic impact on the
regions surrounding Demarest and Washington Township.
The planning consultants appointed by the trial court found
that five of the eight municipalities forming the Pascack
Region, of which Washington Township is a part, have com-
pletely zoned out multi-family housing. The largest com-
munity in the region, River Vale, is only 766 acres larger
than Washington Township, and hence, easily within the
majority's emerging definition of a "developed" community.
As a result, the entire region, consisting of 16,265 acres,
would be free to zone-out multi-family housing. Signifi-
cantly, because of the size of component municipalities, the
Court is exempting from our decision in *Mt. Laurel* an
area which is over 2,000 acres larger than Mt. Laurel itself.

Similarly, the Demarest region, the Northern Valley, is
a composite of small homogeneous municipalities which have
no zoning for multi-family units. Ten of the fifteen towns

in the larger Northern Valley sector have no multi-family housing. Yet the majority indicates that 24% of the housing units in the region are multi-family. See *ante* at 478–479. Assuming that these statistics indicate that the remaining communities have already taken their "fair share" of the region's multi-family housing, and have fulfilled their obligations under *Mt. Laurel,* where will the remaining multi-family housing be built?

The answer under the majority's decision today is that multi-family housing will probably not be built in Bergen County. While county lines are not necessarily definitive of regional housing needs, available county statistics demonstrate the impact that today's decision will have. *See Madison Tp., 72 N. J.* at 521–522. Fifty out of the seventy municipalities in the county are less than three and one-half square miles in size and hence, "developed" under today's decision. *New Jersey County and Municipal Work Sheets,* at 4–7, New Jersey Department of Community Affairs, 1971. Although these communities comprise an area of almost 100 square miles, *id.,* none of the 50 municipalities would be required to provide housing to meet regional housing needs. If housing demands are to be met anywhere in the county, the remaining 20 communities, many of which are only slightly larger in size, would be required to carry the additional burden. Such a result distorts any rational definition of a "fair share" formula.

By evaluating only the vacant land in a given municipality, the majority neglects to consider the accumulation of vacant land in the region surrounding that community. Even though a particular community may only have relatively small parcels of vacant land within its municipal boundaries, there may be sizeable amounts of developable land if the region as a whole is taken into account. For instance, the Pascack Valley Region has 3,028 acres of vacant, developable land. Bergen County, *New Jersey Comprehensive Plan, Existing Land Use,* Final Report, Report No. 11, June 1970. County Planning Board, County of Ber-

gen. Yet as a result of today's decision, no community in the Pascack Region has an affirmative obligation to provide for multi-family housing. Although there are over 3,000 acres which could be used for multi-family housing, eight municipalities may block any part of that land from being used to supply any portion of the estimated 2,000 units of housing which are required annually to meet the present demand in Bergen County.

Municipal boundaries, which may have been drawn decades ago, bear no relationship to the considerations which we found relevant in *Mt. Laurel.* On the contrary, we held in *Mt. Laurel* that the "housing needs of persons of low and moderate income now or formerly residing in the township in substandard dwellings and those presently employed or reasonably expected to be employed therein" to be appropriate standards for determining a community's "fair share." 67 *N. J.* at 190. Various commentators and operative fair share allocation programs suggest additional factors which should be considered in arriving at a community's "fair share."[5] In *Madison Tp.,* I listed some of these factors:

---

[5] *See, e. g., Madison Tp.,* 72 *N. J.* at 593, n. 21 (Pashman, J., concurring and dissenting) ; Brooks, *Lower Income Housing: The Planner's Response* (Am. Soc'y of Planning Officials 1972) ; Rubinowitz, "Exclusionary Zoning: A Wrong in Search of a Remedy," 6 *Mich. J. L. Reform* 625 at 658–61 (1973) ; *Rubinowitz, Low Income Housing: Suburban Strategies* at 65–84, 219–220 (1974) ; Lindbloom, "Defining 'Fair Share' of 'Regional Need': A Planner's Application of *Mount Laurel,*" 98 *N. J. L. J.* 633 (1975) ; Kelly, "Will the Housing Market Evaluation Model Be the Solution to Exclusionary Zoning?," 3 *Real Estate L. J.* 373 (1975) ; Rose, "Exclusionary Zoning and Managed Growth: Some Unresolved Issues," 6 *Rutgers-Camden L. J.* 689 at 709–17 (1975) ; Rose, "From the Courts: The Trickle Before the Deluge from *Mount Laurel,*" 5 *Real Estate L. J.* 69 (1976) ; Rose, "Fair Share Housing Allocation Plans: Which Formula Will Pacify the Contentious Suburbs?," 12 *Urban L. Ann.* 3 (1976) ; N. Williams, *American Land Planning Law* § 66.13(o) (1975 Supp.) ; Bisgaier, "Some Notes on Implementing *Mt. Laurel*: An Admittedly Biased View," 99 *N. J. L. J.* 729, 738, Cols. 3–5 (1976).

. . . the percentage of the region's vacant, developable land which lies within the municipality; whether this land is suitable for low cost housing in terms of its proximity to utilities, transportation facilities and other services; whether it is accessible to available or prospective employment opportunities; whether the town's population density is smaller or greater than in the region at large; whether the town's relative proportion of lower income families is greater or lesser than that in the region as a whole and the extent to which the municipality has heretofore violated the precepts of *Mt. Laurel* by excluding low and moderate income persons.

> [*Madison Township*, 72 *N. J.* at 594–595; Pashman, J., concurring and dissenting.]

On the basis of these criteria, Washington Township's "fair share" can hardly be zero, as the municipality argues. Washington Township has allocated no space to provide suitable housing for the persons now living in the 145 substandard units already existing in that community. Brief of *Amicus Curiae*, Public Advocate of New Jersey, at 15. Nor has it attempted to set aside a place for the older couples and young married persons who currently seek housing in Washington Township, or the employees who would work in the office and research facilities which the Township seeks to develop. Washington Township is close to Paramus and Hackensack, and hence shopping and employment opportunities. Nevertheless, it argues that it has no obligation to provide housing for persons in the region who would take advantage of these opportunities.

Significantly, the majority omits population as a relevant criterion in evaluating a municipality's "fair share" of multi-family dwellings. But population may be an indication of whether a community has sufficient existing facilities to accommodate an influx of new residents. Although a court must be sensitive to potential overcrowding, it is more likely that roads, schools, and sewage facilities which were constructed to meet the demands of a densely populated community are already available for the needs of a modest amount of multi-family housing. Conversely, a community which has vast open spaces but has yet to develop facilities to service that

area may be ill-equipped to cope with an influx of new residents. The majority offers no logical reason why Washington Township, which it classifies as "moderate to low density," should not be required to accommodate its fair share of multi-family housing.

Lastly, the majority carves out vast exceptions, in terms of geography, to the duty which we imposed on communities in *Mt. Laurel.* Obviously, this not only interferes with any attempt by this Court to implement its own decision in *Mt. Laurel,* but impedes any legislative or executive attempt as well. Despite numerous calls for a legislative solution, *see Madison Tp.,* 72 *N. J.* at 535–536; *id.* at 570–571, 575 (Pashman, J., concurring and dissenting); *id.* at 621 (Schreiber, J., concurring in part and dissenting in part); *id.* at 627–628 (Mountain, J., concurring and dissenting); *id.* at 631–632 (Clifford, J., concurring), today's decision presents a major stumbling block for any institution or agency which attempts to equitably apportion housing obligations. Because it places exclusive emphasis on municipal boundary lines, as opposed to housing needs, accumulations of vacant developable land, population, and the availability of existing municipal facilities, it makes it virtually impossible to retain the notion of a "fair share" in apportioning housing obligations.

It is hardly surprising that today's decision conflicts with preliminary attempts to fix an equitable apportionment of housing needs among communities. For instance, in response to our decision in *Mt. Laurel* and Governor Byrne's Executive Order No. 35, April 2, 1976, the Division of State and Regional Planning issued a report attempting to quantify municipal housing obligations. In arriving at each community's "fair share" of housing needs, the report states:

In [*Mt. Laurel*], the New Jersey Supreme Court made it clear for first time that municipalities must take into account not only local housing needs, but also the housing needs beyond the municipality's boundaries in the region of which it is a part. The regional delineation should be reflective of the intent of the *Mt. Laurel* decision and permit the equitable sharing of housing needs between areas with

high levels of present housing needs and few resources and areas with the opposite characteristics.

["A Statewide Housing Allocation Plan for New Jersey," State of New Jersey, Preliminary Draft, November 1976 at 7–8.]

Contrary to the majority's current analysis, the State Regional Planning Office concluded that an equitable allocation of present and prospective housing needs required Washington Township and Demarest to build 398 and 280 housing units, respectively. Since that calculation was based on an attempt to assure that "[n]o municipality would be responsible for more than its proportion, or 'fair share' of the region's present housing need," one can only wonder where these 678 units will be constructed if Washington Township and Demarest have, as a result of today's decision, a "fair share" commitment of zero.

The Court's decision is all the more unfortunate because the available data indicate that the problem of providing decent housing for the citizenry of the State is becoming more acute. Consultants appointed by the trial court cited data by the County Planning Board indicating that in the Pascack Valley Region and in Bergen County alone, a production of 2,052 units per year is needed to accommodate population growth and replacement of existing units. In spite of the expressed need for housing in Bergen County, 99.4% of the residential land supply is zoned for single family dwellings, leaving a mere 141 acres zoned for multi-family housing. *Land Use Regulation, The Residential Land Supply* at 10a, New Jersey Department of Community Affairs, April 1972, Table V. Nor has any attempt been made to balance housing production with future industrial development. Though 3,551 acres of vacant and developable land are zoned in Bergen County for industrial development, *id.* at 6A, no provision has been made for employees who will desire housing near their place of work.[6]

---

[6] Employment opportunities, both present and future, are obviously an important factor to be considered in determining housing require-

Moreover, the housing crisis is not confined to Bergen County. Governor Cahill spoke of the statewide crisis proportions of the problem in *Blueprint for Housing in New Jersey*[7] (1970) and *New Horizons in Housing* (1972), and this Court recognized the severity of the shortage in *Mt. Laurel* when we noted that, "[t]here is not the slightest doubt that New Jersey has been, and continues to be, faced with a desperate need for housing, especially of decent living accommodations economically suitable for low and moderate income families." 67 *N. J.* at 158. *See also, Inganamort, et al. v. Bor. of Fort Lee, et al.,* 62 *N. J.* 521, 527 (1973). Yet, as in Bergen County, statewide planning has ignored the critical need for multi-family housing, particularly for low and middle income persons.[8]

---

ments. The Division of Regional and State Planning notes in its report, "A Statewide Housing Allocation Plan for New Jersey" (Preliminary Draft, 1976), that employment growth is one of four indexes which reflect suitability and ability to accommodate low and moderate income housing needs. *Id.* at 13–14. Professor Rose in an article to appear in *Suburban Housing for the Poor* (to be published in 1977) also notes that existing jobs is a valuable factor in that it would "impose the greatest obligation on those municipalities that reap the advantage of tax revenues from the industrial enterprises that now provide the jobs and that would provide suburban jobs to city residents." In *Mt. Laurel*, the court stated in its discussion of fair share criteria that "in arriving at such a determination the type of information and estimates . . . concerning the housing needs of persons of low and moderate income now or formerly residing in the township in substandard dwellings and *those presently employed or reasonably expected to be employed therein*, will be pertinent." 67 *N. J.* at 190; emphasis added.

[7]Governor Cahill noted the relationship between exclusionary zoning and the housing crises:

Whatever the reasons for the perversion of zoning and planning laws that exists today, I am convinced that we cannot afford the luxury of continuing the status quo in this area. My purpose today is not to condemn the 'home rule' concept in relation to land use. My purpose is to warn you that the system is failing. It is failing because it is not meeting the needs of our people.

[*Id.* at 12.]

[8]*See Land Use Regulation: The Residential Land Supply*, New Jersey, Division of State and Regional Planning (1972). The study

## IV

## APPLYING AN AFFIRMATIVE OBLIGATION TO "DEVELOPED" COMMUNITIES

The majority's decision to limit *Mt. Laurel* to "developing" communities obscures the fact that "developed" municipalities must also have a role in providing low and moderate income housing. An excellent example is Englewood. Justice Hall, speaking for the Court in *DeSimone v. Greater Englewood Housing Corp., No. 1*, 56 *N. J.* 428 at 435 (1970), described that municipality as "one of the older suburban residential communities adjacent to New York City," and "as almost wholly built up." Based on the Court's decision today, Englewood would be considered "developed," and have no obligation to provide needed low and middle income housing. Nevertheless, a unanimous court held that a special reason existed for granting a variance in Englewood, pursuant to *N. J. S. A.* 40:55–39(d), as a way of replacing substandard housing or of furnishing new housing for minority and underprivileged persons outside of ghetto areas.[9] 56

---

indicates that although 82% of the net land supply in 16 counties surveyed was allocated for residential use, only 6.2% of that land was zoned to allow multi-family housing. *Id.* at 6A, 10A. Furthermore, 59% of the net land supply in the 16 counties was limited to one-bedroom or efficiency apartments, 20.5% was allocated to two-bedroom apartments, and only 20.5% remained for apartments consisting of three bedrooms or more. *Id.* at 11A. The report included in its findings:

> With the exception of several rural municipalities, only a very small amount of the net land supply has been zoned to permit multi-family housing. In addition, they are often restricted to small units which are not suitable for families with children.
> [*Id.* at 25]

[9]Similarly, federal courts have granted no exemption for "developed" communities when requiring the construction of multi-family housing for low and moderate income persons as a way of correcting prior racial discrimination. *See, Hills v. Gautreaux*, 425 *U. S.* 284, 96 *S. Ct.* 1538, 47 *L. Ed.* 2d 792 (1976) ; *Kennedy Park Homes Ass'n v. City of Lackawanna, N. Y.*, 436 *F.* 2d 108 (2 Cir. 1970), *cert.* den. 401 *U. S.* 1010, 91 *S. Ct.* 1256, 28 *L. Ed.* 2d 546

*N. J.* at 442. Although we were primarily concerned with providing decent living accommodations for persons already living in Englewood, any such limited application of our holding in that case would contradict our broad definition of the general welfare.

In *Mt. Laurel* we explicitly referred to the continuing role of "developed" communities in providing for regional housing needs. Quoting from a report by the New Jersey County and Municipal Study Commission, Justice Hall emphasized the importance of built-up areas:

> We further agree with the statement . . . '[w]e recognize that new development, whatever the pace of construction, will never be the source of housing for more than a small part of the State's population. The greater part of New Jersey's housing stock is found and will continue to be found in the central cities and older suburbs of the State * * *.' (Substantial housing rehabilitation, as well as general overall revitalization of the cities, is, of course, indicated.)
>
> [67 *N. J.* at 188, n. 21.]

*Cf., Sente v. Mayor and Mun. Coun. Clifton,* 66 *N. J.* 204, 209 (1974). It would be unfair to expect cities and municipalities to revitalize and rehabilitate ghetto areas, but require no commitment from them to supply any of the multifamily housing for which there is a pressing regional demand. The affirmative obligation to provide housing for low and middle income persons must be imposed on "developed," as well as "developing," communities if the Court is to implement the principles it enunciated in *Mt. Laurel.*

## V

## *CONCLUSION*

The majority today effectively neutralizes our holding in *Mt. Laurel.* The Court neglects to consider the troublesome

(1971) ; *Dailey v. City of Lawton,* 425 *F.* 2d 1037 (10 Cir. 1970) ; *Gautreaux v. Chicago Housing Authority,* 304 *F. Supp.* 736 (N. D. Ill. 1969).

effect that its decision will have on "fair share" allocations and defining appropriate regions; by exempting from any affirmative obligations under *Mt. Laurel* a significant number of municipalities, the majority makes an equitable distribution of the burdens of providing for low and moderate family housing impossible. Rather than order a sharing of responsibilities under *Mt. Laurel,* the majority fragmentizes the State by selectively targeting areas which must affirmatively provide for multi-family housing.

Furthermore, today's opinion seriously underestimates the depth and magnitude of the measures needed to correct decades of exclusionary development. I have referred to the tactics of municipalities in avoiding their "fair share," *Madison Tp., supra* 72 *N. J.* 567–571 (Pashman, J., concurring and dissenting); and the reluctance of courts to forcefully implement our decision in *Mt. Laurel, supra,* 67 *N. J.* at 83. Today's decision can only provide new incentives to communities which seek to escape their constitutional and statutory duties. Consequently, we can offer no hope that new advances will be made in our efforts against exclusionary zoning.

Unfortunately, the effect of today's decision will be long lasting. State regulation embodied in the zoning power deeply affects the racial, economic, and social structure of our society, and locks people into an environment over which they have no control. Generations of children are relegated to a slum schooling and playing in the overcrowded and congested streets of the inner cities. Men and women seeking to earn a living for themselves and their families are barred by distance from job markets. Society as a whole suffers the failure to solve the economic and social problems which exclusionary zoning creates; we live daily with the failure of our democratic institutions to eradicate class distinctions. Inevitably, the dream of a pluralistic society begins to fade.

This Court has been in the vanguard declaring the right of children to a thorough and efficient education, *Robinson v. Cahill,* 62 *N. J.* 473 (1973); the right of all persons to

acquire, own, and dispose of real property, *Jones v. Haridor Realty Corp.*, 37 *N. J.* 384, 391 (1962); and the right of all persons to share equal access to the State's resources, *Neptune City v. Avon*, 61 *N. J.* 296 (1972). Today we make a mockery of those rights by perpetuating a ghetto system in which residents live in inferior and often degrading conditions. Unless and until we open up the suburbs to all citizens of the State on an equal basis, the cherished ideals of our constitutional rights will remain illusive and unattainable.

SULLIVAN and SCHREIBER, J.J., concurring in the result.

*For modification*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, CLIFFORD and SCHREIBER and Judge CONFORD—6.

*Dissenting*—Justice PASHMAN—1.

